[This opinion has been published in *Ohio Official Reports* at 73 Ohio St.3d 52.]

CHAN, APPELLEE, *v.* MIAMI UNIVERSITY, APPELLANT.

[Cite as *Chan v. Miami Univ.*, 1995-Ohio-226.]

*Universities and colleges—Civil rights—Graduate student's formal complaint of sexual harassment against tenured professor—Employment contract provides procedures "for dismissal or removal from tenure"—Removal procedures not followed and contract breached, when.*

(No. 93-2374—Submitted February 22, 1995—Decided August 16, 1995.)

APPEAL from the Court of Appeals for Franklin County, Nos. 93AP-213 and 93AP-309.

———————————

{¶ 1} Miami University, appellant, granted tenure to appellee, Dr. F. Gilbert Chan, as professor of history in 1976. Chan's employment contract was evidenced by letters of appointment for each year in which he was employed by the university. The letters of appointment incorporated "the rules, regulations, and procedures as published in the Miami University Information Manual [the 'manual'], and official actions of the Board of Trustees."

{¶ 2} In January 1990, a female graduate student filed a formal complaint of sexual harassment against Chan. The complaint was filed with the university's Office of Affirmative Action. Following an investigation by the university's Affirmative Action and Human Resources Office, a hearing was held pursuant to Section 3.71 of the manual. The hearing committee found that Chan had violated the university's policy prohibiting sexual harassment and recommended to the vice-president that Chan be suspended for two years without pay. The university's acting executive vice-president determined that Chan should be terminated from his position rather than suspended. That decision was appealed to the university

president, who affirmed the vice-president's decision. Chan's employment with the university was terminated on August 10, 1990.

{¶ 3} Chan filed a complaint against the university in the Court of Claims, asserting breach of contract, and age and sex discrimination. At trial, the age and sex discrimination claims were dismissed, and the matter was heard by the trial court. The court found in favor of the university on the breach-of-contract claim and held that it lacked jurisdiction to consider whether Chan's due process rights were violated.

{¶ 4} Both Chan and the university filed timely appeals, which were subsequently consolidated. The Franklin County Court of Appeals reversed the trial court, holding that the university had breached its employment contract with Chan and had denied him due process by terminating his tenure, using the procedures for resolving a formal complaint of sexual harassment provided by the manual, and remanded the cause to the trial court.

{¶ 5} The matter is now before this court pursuant to the allowance of a motion to certify the record.

_____

*J.C. Shew & Associates* and *J.C. Shew*, for appellee.

*Betty D. Montgomery*, Attorney General, and *Gregg H. Bachmann*, Assistant Attorney General, for appellant.

*McTigue & Brooks* and *Paula L. Brooks*, urging reversal for *amicus curiae*, Ohio National Organization of Women.

_____

**MOYER, C.J.**

{¶ 6} The issue presented by this appeal is whether the university breached its contract when it terminated Professor Chan's employment pursuant to the university rule prohibiting sexual harassment rather than the rule providing for termination of tenured faculty.

**{¶ 7}** We first address the university's procedure for determining sexual harassment claims. Section 3.211 of the manual, which was incorporated into the contract between the university and Chan, states the following with respect to the working and learning environment of the university:

"It is Miami University's position that employees and students should have a working and learning environment free from intimidation, hostility, or other offensive conditions. It is the policy of the University that sexual harassment shall not be condoned or permitted. It is also the University's policy that false accusations of sexual harassment shall not be condoned or permitted, such behavior also being considered a form of intimidation. Individuals found to be in violation of this policy shall be subject to appropriate disciplinary action, including written warning, suspension, or dismissal, within the guidelines of the grievance procedures of the appropriate authority. (Approved by the Board of Trustees October 15, 1981)."

**{¶ 8}** Section 3.212 of the manual defines "sexual harassment" and suggests informal procedures to resolve complaints.[1] Section 3.212(E) provides that if informal resolution of the complaint is not achieved by the Office of Affirmative Action with the assistance of appropriate divisional affirmative representatives, then the university's formal procedures for affirmative action grievances provided in Sections 3.7 and 3.71 of the manual are available. A careful review of Section 3.71 is critical to our determination, as it was that section of the manual rather than the section that expressly provided for termination of tenured faculty (Section 3.555) that was used to terminate Chan's employment.

**{¶ 9}** Section 3.71 of the manual, in combination with Section 3.211, provides the grievance procedure available to any employee and student of the

---

1. In 1991, the university amended Section 3.212 to strongly urge informal resolution of sexual harassment complaints by setting forth a procedure for mediation. The amendment does not apply to the grievance herein.

university who believes that his or her rights under the university's affirmative action policy have been violated. It begins with several precatory paragraphs:

"By means of the procedures described below, Miami University provides an opportunity for any employee to express a grievance and receive a fair hearing.

"***

"Most complaints can be resolved through discussion between staff member and immediate supervisor. Individuals are encouraged to engage in direct consultation with each other so that the problem can be solved through conciliation, if possible. Any retaliation against an employee for having made a complaint is grounds to file a second complaint based on retaliation."

{¶ 10} That language is followed by the formal procedures that are available if informal procedures are not successful.

{¶ 11} Under the formal grievance procedures, set forth in Section 3.71 of the manual, a complainant may file a written complaint with the university's Affirmative Action Officer, who provides the respondent with notice of the complaint, conducts a formal investigation of the complaint to make a finding of probable cause, and communicates that finding to the complainant and respondent.

{¶ 12} If the formal complaint is not resolved and a finding of probable cause is made, then a hearing is set and a hearing panel of three persons is established from a pool of twenty-five retired university employees. Section 3.71 does not provide either the complainant or the respondent with the right to be represented by an attorney at the hearing, but each has the right to have the assistance of an advisor or counselor from the university faculty or staff. The hearing committee presents its findings and recommendations to the vice-president to whom respondent reports or the president's designate, who makes a decision on the recommendation. Either party has a right to appeal the decision of the vice-president to the president, who has the final decision-making authority on the grievance.

4

**{¶ 13}** It is important to note that all of the aforementioned procedures are subject to very short deadlines; even the complainant is required to file the grievance within forty-two calendar days from the date of the alleged act of "discrimination." It seems clear that in adopting Section 3.71, the university believed it was important to resolve quickly complaints against university personnel that arose out of alleged acts of discrimination or sexual harassment.

**{¶ 14}** We next review the sections of the manual that provide expressly for termination of a tenured appointment. Section 3.428 of the manual provides that "[t]ermination of an appointment with tenure prior to retirement may be effected by the University for only two reasons: adequate cause or financial exigency." "Adequate cause" is defined in subsection (A) as follows: "*Adequate cause* relates to performance of a faculty member in his or her professional activities as teacher or researcher."

**{¶ 15}** Section 3.553 of the manual, entitled "Termination of Appointment or Tenure for Cause," and Section 3.555, entitled "Procedures for Disciplinary Action," describe the circumstances which might occasion termination for cause and indicate the procedures to be used. Section 3.555 states, "[t]he following procedures shall be adhered to in taking disciplinary actions against a member of the instructional staff." The procedures for disciplinary actions applicable to nonreappointment and termination of appointments are summarized as follows: "When a question arises as to taking disciplinary action against a member of the instructional staff ***," a private conference following a notice to staff member is conducted with the president, the provost, appropriate academic dean and department chair, and the staff member is entitled to be represented by legal counsel. After the conference the president may dismiss the charges or administer a reprimand. If the charges are not dismissed, then the president or the staff member may request the Committee on Faculty Rights and Responsibilities to consider the matter. Subsequently, the committee makes a recommendation to the president that

the charges be dismissed, that the reprimand be sustained, or that formal charges be initiated against the staff member seeking his or her dismissal or removal from tenure. If the president adopts the recommendation of the committee to dismiss or remove the tenured staff member from tenure, then the president files formal written charges against the staff member setting forth the grounds for dismissal or removal from tenure. In that instance, the rules provide for a hearing.

{¶ 16} Section 3.555(E) sets forth the hearing procedures, which include time limits for scheduling; a staff member's right to be represented by legal or other counsel; representation of the president at the hearing; and presentation of evidence at hearing by witnesses, including cross-examination and production of a transcript of the hearing at the university's expense. Pursuant to a time deadline, the committee reports its decision to the president and to the faculty member. A critical provision, Section 3.555(F), provides that within five days after receipt of the committee's decision, either the president or the faculty member has the right to appeal the decision of the committee to the board of trustees of the university, which has the authority to make the final decision.

{¶ 17} The university and Chan agree that the appropriate procedure and the procedure used to determine the sexual harassment complaint against Chan is Section 3.71 of the manual. Chan contends that in addition to the procedure prescribed for determining an affirmative action or sexual harassment grievance, he is entitled, by his contract, to the procedure set forth in Section 3.555, if the university desires to dismiss or remove him from tenure. Our analysis of the manual causes us to conclude that the university breached its contract with Chan when it terminated his employment without affording him the procedures in Section 3.555 that apply to the nonreappointment and termination of appointment.

{¶ 18} Chan's employment contract, comprised of letters of appointments that incorporate the university's manual and resolutions adopted by the board of trustees, is expressly written and is therefore properly interpreted as a matter of law

by the court. *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph one of the syllabus. We are also bound by the consistent rule of law that "an instrument must be considered and construed as a whole, taking it by the four corners as it were, and giving effect to every part; but when one part is certain on a given subject, and all the other parts are uncertain on that subject, the certain will prevail over the uncertain[.]" *Brown v. Fowler* (1902), 65 Ohio St. 507, 523, 63 N.E. 76, 78.

{¶ 19} The university argues that the procedure for resolution of sexual harassment-grievance complaints takes the place of the procedure for terminating the contract of a tenured professor and that the grievance procedure provides adequate procedural safeguards to the respondent. In support of this argument the university cites Section 3.211 of the manual, which states, "*** [i]ndividuals found to be in violation of this policy shall be subject to appropriate disciplinary action, including *** dismissal, within the guidelines of the grievance procedures of the appropriate authority."

{¶ 20} There is nothing in that section that supersedes the clear direction of Section 3.555 that a disciplinary action hearing is "for dismissal or removal from tenure," Section 3.555(D), and that the procedures in Section 3.555 "*** shall be adhered to in taking disciplinary action against a member of the instructional staff." When the references to "the grievance procedur[e] of the appropriate authority" in Section 3.211 are read *in pari materia* with the commands of Section 3.55, it is clear that Section 3.555 controls the procedure for terminating a tenured professor.

{¶ 21} The purposes of the two procedures are distinctly different. The grievance procedure under Section 3.7 is defined as "*** an opportunity for any employee to express a grievance and receive a fair hearing." Section 3.71 of the manual, entitled Formal Procedures for Affirmative Action Grievances, is a procedure designed to enable an employee to file a personal grievance against another employee or member of the university staff. The procedure under this

section applies to all affirmative action discrimination grievances. The ultimate determiner of that grievance is the president of the university. As the court of appeals correctly observed, the entire grievance process is expressly tailored to preserve a complainant's rights and produce an eventual resolution of the grievance. The procedure does contemplate some form of disciplinary action, but does not expressly include the termination of a contract as under Section 3.555. Even the affirmative action director in this case appeared to recognize the difference. In his letter of finding he stated, "[b]ased on this Letter of Finding, the chair of the department of history should recommend immediate and appropriate disciplinary action against Dr. Chan. If Dr. Chan contests this Letter of Finding, or if this matter is not resolved as a consequence of a[n] appropriate disciplinary action, the complainant *** has the right to call for the convening of a Hearing Committee. ***"

{¶ 22} Section 3.7(B)(2) states that "[o]ther members of the instructional staff may pursue a solution through appeal to the Faculty Rights and Responsibilities Committee if the grievance relates to the complainant's role as a member of the instructional staff." The focus of a Section 3.71 hearing is the resolution of a complainant's grievance; it is silent with respect to the procedures to be used if it is determined that a grievance is well taken and that the conduct producing the grievance subjects a tenured faculty member to dismissal from the university. The time limits under the Section 3.71 procedure clearly indicate that the university desires to have grievances arising from affirmative action or sexual harassment claims resolved quickly. Also significant is the fact that there is no provision for a respondent to be represented by counsel in any of the grievance proceedings.

{¶ 23} The procedure prescribed for termination of tenured employees pursuant to Section 3.555 is different in focus and purpose from the grievance procedure. The most striking difference is the fact that in a Section 3.555

procedure, it is the university president who files the formal complaint against the faculty member and it is the board of trustees that makes the ultimate decision if the faculty member does not agree with the recommendation of the hearing committee. The staff member in the disciplinary hearing is expressly given the right to be represented by counsel both in the first meeting with the university president to discuss the discipline matter and in the hearing on the formal charges against him.

**{¶ 24}** It is simply not reasonable to assume or conclude that a procedure established for the resolution of affirmative action grievances between or among members of the university is intended to take the place of a procedure that expressly provides for the determination of whether conduct by a tenured faculty member constitutes grounds for terminating the university's contract with the faculty member. Likewise, it is unreasonable to assume that the university considers discrimination or sexual harassment to be a less serious offense against a person than an offense that does not constitute an affirmative action grievance. The purpose of the two procedures is different, the due process afforded the tenured faculty member is different, and the entity rendering the final decision is different.

**{¶ 25}** The university's argument would result in a tenured professor who is accused of an affirmative action grievance being given less due process in determining whether the tenured professor will be terminated than a tenured professor accused of any other offense rising to the level of "adequate cause." The university does not appear to view an allegation of sexual harassment as less significant than an allegation constituting some other basis for "adequate cause" offenses. As a matter of law, the university may not tailor procedural due process to the offense charged rather than the right deprived.

**{¶ 26}** Although the issue before us can be decided upon an interpretation of the contract between Chan and the university, we will also dispose of the due-process argument raised by Chan. There is no argument that the granting of tenure

creates an expectation of continued employment subject to discharge for cause. The United States Supreme Court stated in *Perry v. Sindermann* (1972), 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570, 580, that "[a] written contract with an explicit tenure provision clearly is evidence of a formal understanding that supports a teacher's claim of entitlement to continued employment unless 'sufficient cause' is shown." Tenure has the status of a property right and may be deprived pursuant to constitutionally adequate procedures defined by the right itself. *Cleveland Bd. of Edn. v. Loudermill* (1984), 470 U.S. 532, 538-541, 105 S.Ct. 1487, 1491-1493, 84 L.Ed.2d 494, 501-503; *Perry*, *supra*.

{¶ 27} Nor is there any question that Chan was entitled to retain legal counsel of his choosing to assist in his defense of his tenured status in an administrative proceeding. *Goldberg v. Kelly* (1973), 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287. "The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law." *Powell v. Alabama* (1932), 287 U.S. 45, 68-69, 53 S.Ct. 55, 64, 77 L.Ed. 158, 170. Indeed, the university's procedure for termination of a tenured professor expressly gives the professor a right to be represented by counsel at all stages in the proceeding.

{¶ 28} The university argues that because Chan was permitted in the grievance procedure to have the assistance of an advisor or counselor from the university faculty or staff and because the person selected by Chan happens to be an attorney, his due process rights were protected. As the court of appeals observed, the fact that Chan was represented by a faculty advisor who is licensed to practice law is of no significance, since the record clearly reveals the advisor was permitted to act only in his capacity as faculty advisor during the grievance. Our review of the record supports that conclusion of the court of appeals.

{¶ 29} We conclude that the contract between the university and Chan provided a procedure under which the complaint of sexual harassment against Chan

was resolved in favor of the complainant and against Chan. The contract also provides a separate procedure to determine whether the finding of sexual harassment against Chan constituted "adequate cause" (see Section 3.428 of the manual) for disciplinary action resulting in the termination of his tenured status with the university. Because the university terminated Chan's contract without complying with its express procedure for termination of tenured faculty, the university breached its contract with Chan and denied him due process of law.

{¶ 30} For the foregoing reasons the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., WRIGHT, PFEIFER and COOK, JJ., concur.

DOUGLAS, RESNICK and F.E. SWEENEY, JJ., dissent.

———————————

**FRANCIS E. SWEENEY, SR., J., dissenting.**

{¶ 31} I respectfully dissent from the judgment of the majority. For all of the following reasons, I believe that the court of appeals' judgment should be reversed and that judgment should be entered in favor of Miami University.

{¶ 32} Strong public policy considerations and case law have established a duty on employers to provide a safe work environment free of sexual harassment for its employees and, thus, employers may be held liable for failing to take corrective action against an employee who poses a threat of harm to fellow employees. *Kerans v. Porter Paint Co.* (1991), 61 Ohio St.3d 486, 493, 575 N.E.2d 428, 433. See, also, *Helmick v. Cincinnati Word Processing, Inc.* (1989), 45 Ohio St.3d 131, 543 N.E.2d 1212. In *Kerans*, the Ohio Supreme Court stated that "*** where an employer knows or has reason to know that one of his employees is sexually harassing other employees, he may not sit idly by and do nothing. The appropriate response, which may range in severity from a verbal warning *** to a

firing, will depend on the facts of the particular case.  \*\*\*"  *Kerans* at 493, 575 N.E.2d at 433-434.

{¶ 33} Federally, courts have held that, in Title IX cases, educational institutions are liable upon a finding of sexual harassment perpetrated by a supervisor if an official representing the institution knew or should have known of the harassment's occurrence, unless the official can show that appropriate steps were taken to halt the harassment.  *Lipsett v. Univ. of Puerto Rico* (C.A.1, 1988), 864 F.2d 881, 901, citing *Meritor Sav. Bank, FSB v. Vinson* (1986), 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49.

{¶ 34} Title IX of the Education Amendments of 1972, as found in Sections 1681 *et seq.*, Title 20, U.S.Code, requires public institutions of higher learning to comply with United States Department of Education guidelines designed to eliminate discrimination.  On May 9, 1980, the United States Department of Education promulgated guidelines designed to eliminate discrimination based upon sex in federally assisted educational institutions.  Section 106.1 *et seq.*, Title 34, C.F.R.

{¶ 35} In response to a study in 1980 by the federal Equal Employment Opportunity Commission on sexual harassment and to comply with United States Department of Education regulations under Section 106.8, Title 34, C.F.R., Miami University drafted a policy prohibiting sexual harassment for the University and procedures implementing that policy.  The University's board of trustees passed a resolution approving the University's policy, which is contained in Section 3.211 of the Miami University Policy and Information Manual.  Miami University was at the leading edge in the developing law on sexual harassment when it created this sexual harassment policy and disciplinary procedure.  On October 29, 1981, the University placed all employees on notice of how seriously it viewed the new policy when it published the substance of its policy prohibiting sexual harassment in the

Miami University Report, which is the University's faculty and employee newspaper.

**{¶ 36}** In this newspaper, the University stated its position that "employees and students should have a working and learning environment free from intimidation, hostility, or other offensive conditions." The University enacted this policy to protect its employees and students against such offensive conduct and to discipline the wrongdoers.

**{¶ 37}** The guidelines of the grievance procedure referred to in Section 3.211 for sexual harassment complaints concerning faculty members are contained in Section 3.71 of the University's manual. The regulations and procedures implementing the policy found in 3.211 of the manual are contained in 3.212 of the manual. Sections 3.212(A)(1) and (2) of the University's manual identify what the United States Supreme Court in *Meritor Sav. Bank, FSB v. Vinson*, *supra*, at 65, 106 S.Ct. at 2404-2405, 91 L.Ed.2d at 58-59, called *quid pro quo* sexual harassment. Section 3.212(A)(3) identifies what the United States Supreme Court in *Meritor* termed "hostile environment" sexual harassment. *Id.* at 65, 106 S.Ct. at 2405, 91 L.Ed.2d at 59.

**{¶ 38}** In contrast to Sections 3.211, 3.212 and 3.71 of the manual, Section 3.555 is a tenure provision which addresses general causes for termination of tenure. In *Rehor v. Case W. Res. Univ.* (1975), 43 Ohio St.2d 224, 230-231, 72 O.O.2d 127, 131, 331 N.E.2d 416, 421, this court discussed the purpose behind tenure as ensuring that a professor "*** will not lose his job for exercising academic freedom, namely, his rights to teach, to think and to speak in accordance with his conscience ***." See, also, *Keyishian v. Bd. of Regents* (1967), 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629. Thus, Section 3.555 is clearly designed to protect an employee from losing his tenure for exercising these freedoms.

**{¶ 39}** Sections 3.211, 3.212, and 3.71 were created subsequent to the tenure provisions to specifically address the grievance process and disciplinary

procedures for sexual harassment cases.  These sections apply to *all* employees, including tenured employees.  Section 3.211 of the manual states that "sexual harassment shall not be condoned" and that "[i]ndividuals found to be in violation of this policy shall be subject to appropriate disciplinary action, including written warning, suspension, or *dismissal*, within the guidelines of the grievance procedure of the appropriate authority."  (Emphasis added.)  The hearing and appeal procedures are contained in Section 3.71, and the decision on appeal is "final" under Section 3.71(G).  Section 3.71 is incorporated by reference in Sections 3.211 and 3.212.  These disciplinary procedures do not implicate any right to a hearing under Section 3.555, and, in fact, since a decision on appeal is final, an employee should be aware that he is not then entitled to a separate hearing under Section 3.555.

{¶ 40} In the present case, Chan's hearing convened on May 7, 1990 and lasted four days.  During that time, six witnesses testified on behalf of the complainant and nine testified for Dr. Chan.  Forty separate exhibits were presented at the hearing.  The committee exercised its discretion and rejected some of the documentary and testimonial evidence.

{¶ 41} On June 5, 1990, the hearing committee found that Chan engaged in both *quid pro quo* and hostile environment sexual harassment in violation of the University's policy prohibiting sexual harassment under Section 3.211 of the manual as incorporated in Section 3.21(A).  The acting vice president and provost, Joseph T. Urell, reviewed the committee's findings as required under Section 3.71(E), examined all documentation accepted into evidence by the committee, met with the committee to discuss the evidence heard and conclusions reached, and listened to relevant sections of the thirty-three hours of audiotape from the hearing.  Dr. Urell later testified, in the Court of Claims, that Chan's sexual harassment was "blatant" and "was a very serious matter that constituted a grievous abuse of power."  Further, he testified that "[i]t was also a case in dealing with an individual who was particularly vulnerable, an individual who was a foreign student."  From

this review, Dr. Urell made a determination that this conduct warranted Chan's termination from the University.

{¶ 42} Based on the strong public policy against condoning such egregious conduct, it is unfortunate that the majority refuses to support the University's scrupulous application of this disciplinary procedure as to Chan. Clearly, Chan's conduct of engaging in both *quid pro quo* and hostile environment sexual harassment against a female graduate student was precisely the type of conduct which the disciplinary procedure was designed to protect the community against. Furthermore, Chan's termination was an appropriate penalty here considering the seriousness of the crime committed by him. The majority's decision effectively neutralizes the University's sexual harassment disciplinary procedure by allowing the wrongdoer to avoid the force and effect of the procedure's penalty determination.

{¶ 43} Chan's tenure as a professor was not a vested right exempt from standards of employee conduct. See *Rehor*, *supra*. As part of his employment with the University, Chan was aware that he was subject to the responsibilities and obligations outlined in the University's Policy and Information Manual. The manual in conjunction with Chan's annual letter of appointment amounted to his contract with the University, setting forth the general conditions of employment. Chan has admitted that he maintained a copy of the University manual from the beginning of his employment. Chan admits he was aware that he was obligated to adhere to the University's policy prohibiting sexual harassment. Furthermore, Chan was aware that formal procedures existed to address the charge of sexual harassment, and that if he were found guilty, he could receive the discipline of termination. Moreover, Chan admits that any penalty levied against him would be taken as a result of the sexual harassment grievance procedure and hearing committee and review process. Since it is undisputed that Chan knew he was subject to the sexual harassment policy and disciplinary procedure as part of his

contract with the University, and that a finding of guilty could result in his termination under the disciplinary procedure, Chan should not now be allowed to avoid being subject to the University's decision. Such a result not only goes against public policy and Chan's contract with the University, but it could also deter future victims of this heinous conduct from raising complaints if they believe they have no meaningful recourse. Furthermore, failing to uphold the University's policy and disciplinary procedure could subject the public institution to charges by victims when the victim's complaints are not adequately resolved by the University.

{¶ 44} In addition, Chan waived any rights under Section 3.555 of the manual, as he never objected to the Section 3.71 disciplinary procedure being used against him and the potential that it could result in his termination.

{¶ 45} Chan was evidently aware of the Section 3.555 Committee on Faculty Rights and Responsibilities due to a previous disciplinary procedure. However, at no time throughout the seven-month sexual harassment disciplinary process did he ever request a hearing under Section 3.555. Likewise, he never objected to the absence of paid outside counsel. Chan stipulated that Gary Hunter, the University's affirmative action and human resources officer, met with him in January 1990, and explained to him the disciplinary process and the penalties that could be taken against him. Chan stipulated that he knew he could be terminated as a result of this sexual harassment policy and disciplinary procedure. Even on appeal, Chan never raised any right to a second hearing under Section 3.555, nor did he object to the absence of paid outside counsel. Instead, Chan waited until he filed a lawsuit in the Court of Claims to raise a right-to-counsel issue. In waiting so long, Chan waived his right to now raise a constitutional challenge. See *South-Western City Schools Bd. of Edn. v. Kinney* (1986), 24 Ohio St.3d 184, 24 OBR 414, 494 N.E.2d 1109.

{¶ 46} Moreover, even if Chan did not waive his constitutional challenge, Chan's argument that the Fourteenth Amendment Due Process Clause of the United

States Constitution required that he have a right to paid outside counsel is without merit. Due process requires that the state give an individual notice and a fair hearing where it is depriving that individual of a property interest. *Goldberg v. Kelly* (1970), 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287. Whether a hearing is fair is determined by courts on a case-by-case basis. *Mathews v. Eldridge* (1976), 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18.

{¶ 47} While this court has not previously addressed the issue of a college professor's right to counsel at a due process hearing, federal courts addressing this issue have found that a university's failure to provide college professors with the right to retain counsel did not violate due process. *Frumkin v. Bd. of Trustees* (C.A.6, 1980), 626 F.2d 19; *Toney v. Reagan* (C.A.9, 1972), 467 F.2d 953. See, also, *Rosewitz v. Latting* (C.A.10, 1982), 689 F.2d 175; *Rodgers v. Norfolk School Bd.* (C.A.4, 1985), 755 F.2d 59; Chang v. Park (C.A.3, 1975), 514 F.2d 382; *Downing v. LeBritton* (C.A.1, 1977), 550 F.2d 689; *Yashon v. Hunt* (C.A.6, 1987), 825 F.2d 1016; *Crook v. Baker* (C.A.6, 1987), 813 F.2d 88. The courts distinguish between the status of welfare recipients, such as in *Goldberg v. Kelly*, and university professors or other similarly situated employees. Discussing this distinction, the Ninth Circuit in *Toney v. Reagan*, *supra*, at 958, stated that "*** welfare recipients dealing with state officials are in a class far more likely to be in need of the services of counsel than college professors dealing with their peers." In finding that there was no right to counsel, the court held: "In the absence of a showing of special circumstances in this case requiring the presence of counsel, we are unwilling to invalidate the state procedures on this ground." *Id.* Likewise, in *Frumkin v. Bd. of Trustees*, *supra*, the Sixth Circuit found that a restricted right of counsel did not deprive a tenured professor (terminated for unprofessional conduct, among other things) of his procedural due process rights. As there was no indication that the expansion of the lawyer role would have been a significant benefit to the professor, the court declined to "force the internal academic affairs of

Kent State University into an adversary mold resembling a criminal trial." *Frumkin*, *supra*, at 22.

{¶ 48} Applying the above federal precedent to the present case, I believe that Chan was given a fair hearing that did not deprive him of his procedural due process rights. The record demonstrates that, while Section 3.71 does not entitle Chan to outside counsel, nevertheless, in this case Chan received all the benefits of outside counsel and, thus, was not prejudiced. Chan was represented by Professor Wayne Staton, who served as his chosen counselor for the formal hearing. Staton was also Chan's personal attorney during that time period. Chan has stipulated that Staton performed every function that outside counsel would have performed, including conducting direct and redirect examinations, making opening and closing arguments, and raising objections on behalf of Chan. Accordingly, there is no indication that Chan would have received any significant benefit had be been allowed paid outside counsel. See *Frumkin v. Bd. of Trustees*, *supra*. Thus, Chan's claim that he was prejudiced due to his inability to hire outside counsel is completely without merit.

{¶ 49} Based on the foregoing, I believe that the court of appeals' judgment should be reversed and, accordingly, judgment should be entered in favor of Miami University.

DOUGLAS and RESNICK, JJ., concur in the foregoing dissenting opinion.

_____