[Cite as *Eckel v. Bowling Green State Univ.*, 2010-Ohio-3225.]

Court of Claims of Ohio

The Ohio Judicial Center

65 South Front Street, Third Floor

Columbus, OH 43215

614.387.9800 or 1.800.824.8263

www.cco.state.oh.us

NORMAN I. ECKEL, Ph.D.

 Plaintiff

 v.

BOWLING GREEN STATE UNIVERSITY

 Defendant

 Case No. 2007-02815

Judge Clark B. Weaver Sr.

DECISION

**{¶ 1}** Plaintiff brought this action alleging breach of contract. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.[1]

**{¶ 2}** In 1979, plaintiff began his employment with defendant as an assistant professor. In 1982, plaintiff earned a Ph.D. in accounting and economics. In 1985, plaintiff was awarded tenure and became an associate professor of accounting.

**{¶ 3}** Plaintiff's employment was governed by a series of one-year contracts. On June 14, 2004, Robert Edmister, Dean of the College of Business Administration, issued a faculty appointment letter to plaintiff, wherein he stated that: "This appointment letter confirms the details of your appointment as Associate Professor, full-time, Tenured Faculty, for the fiscal year 2004-2005. Except as modified by the terms of this letter, your Contract For Faculty Employment ('Agreement') remains in full force and effect." (Joint Exhibit B).

**{¶ 4}** During the spring semester of the 2004-05 academic year, plaintiff taught three courses of Accounting 222, which met twice weekly on Tuesdays and Thursdays for approximately one hour and 15 minutes per session. On Tuesday, February 1, 2005, plaintiff had been teaching a class that started at 11:30 a.m.[2] At approximately 12:30 p.m., one of plaintiff's students arrived for class. Plaintiff testified that he was frustrated that the student arrived one hour late.

---

[1]After the completion of the presentation of plaintiff's evidence, defendant moved for dismissal pursuant to Civ.R. 41(B)(2). The court took the motion under advisement. For the reasons set forth in this decision, defendant's motion is DENIED.

[2]All dates referenced herein shall pertain to the year 2005 unless otherwise noted.

{¶ 5} Plaintiff confronted the student and asked him if he knew what time it was. According to plaintiff, the student looked disheveled and disoriented. Plaintiff told the student that he should go back to his dormitory because there was no reason to stay for only 15 minutes. Plaintiff asked the student to leave the classroom.

{¶ 6} After this confrontation, plaintiff made a gesture with his hand, as if he were pointing a gun to his own head, and said, "Duh." Immediately afterward, plaintiff stated to his class something such as: "No, I shouldn't shoot myself. I should bring my AK-47 to class and shoot all of you." Plaintiff continued by stating that there were "30 rounds to a clip" and that "two clips should about do it." After chuckling, plaintiff then stated, "No, really ... I really should do it."

{¶ 7} Plaintiff continued teaching the class and then taught his regularly-scheduled classes for the rest of the day. Plaintiff was not scheduled to teach on Wednesdays. On Thursday, February 3, plaintiff taught his regularly-scheduled classes without incident. After his last class on Thursday, plaintiff was summoned to a meeting in Dean Edmister's office. Plaintiff was advised that several students had complained about the comments that he had made on the previous Tuesday. During the meeting, plaintiff admitted that he had made the comments, explained that "it was a stupid thing to say," and claimed that he had been joking. Plaintiff offered to apologize to his class. Later that day, plaintiff was advised that he had been suspended from the university for the remainder of the semester with pay.

{¶ 8} On February 4, Nancy Merritt, Associate Dean for Undergraduate Studies in Business, sent an e-mail to the students who

were enrolled in plaintiff's 11:30 a.m. class. In the e-mail, Merritt informed the students that the comments that plaintiff had allegedly made in Tuesday's class were being investigated, and that a substitute instructor would be provided. Students were urged to contact Dr. Tim Chambers, Director of Undergraduate Studies in Business, Dr. Larry Kowalski, Department Chair, or Dr. Merritt with any comments or concerns.

{¶ 9} On February 7, Dean Edmister sent plaintiff a letter advising him that he had received complaints from several students alleging that plaintiff had engaged in conduct that was construed as a threat to the personal safety of the students in the accounting class. Dean Edmister stated the following: "If these allegations are true, your conduct would be deemed inconsistent with your responsibilities as a faculty member under the Academic Charter and your employment contract with the University. Because I have preliminarily determined that the allegations appear credible and that they involve a very serious matter, I have decided to immediately suspend you from your duties without loss of pay and to restrict your access to the campus, as further detailed below, pending investigation and resolution of this matter." (Joint Exhibit G.) Dean Edmister cited provisions of both the academic charter the Ohio Revised Code that plaintiff may have violated.[3]

---

[3]The letter states as follows:

"Part B, Division II. Section E: Employee Responsibilities, states that 'faculty members are expected
to abide by the standards of professional ethics and responsibilities';

"Part B, Division II, Ethical Responsibilities, Section F 2. b) (1) provides that one of our responsibilities, as teacher-scholar is:

**{¶ 10}** In the letter, Dean Edmister also informed plaintiff that Dr. Merritt would lead an investigation regarding the allegations; that the allegations would be "sustained" if it were found that "the important facts relating to the allegations are more likely true than not <u>and</u> that those facts violate one or more of the above standards. In that event, appropriate remedial measures will be taken by me as the decisional authority." (Emphasis in original.) Dean Edmister also went on to state that "[a]s the decisional authority, I will review the findings of the investigation and will ultimately determine whether one or more of the standards have been violated and, if so, what remedial measures are appropriate under the circumstances. Because of the gravity of the allegations in this matter, if the allegations are sustained and there is a finding of culpability, that finding could be considered sufficient grounds to support disciplinary action against you."

**{¶ 11}** Dean Edmister also stated in the letter that pending the investigation, plaintiff was not permitted to be present on campus at any time without the dean's prior consent and the prior consent of plaintiff's

---

"(1) The responsibility to assure the student's freedom to learn, through maintaining an atmosphere conducive to free inquiry, *the respect of the student as an individual*, and the evaluation of students based on professionally judged academic performance without regard to personal or political matters irrelevant to that performance; and

"<u>Part B. Division II, Ethical Responsibilities</u>, Section F 4: provides in relevant part that, 'It is the policy of Bowling Green State University that acts of violence, threats of violence, or intimidation will not be tolerated." (Emphasis in original.)

The letter also states that R.C. 2903.21(A) states that: "No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person * * *."

department chair. The letter also stated that plaintiff had the right to submit a written response to the allegations; that he would be afforded an interview during which he could verbally present his position; that he had the right to seek the advice of counsel at his own expense and that counsel could attend the interview but would not be permitted to answer questions for him, make statements on his behalf, or to delay or interrupt the interview; and that plaintiff would be advised in writing of the dean's decision on the matter and any disciplinary or remedial measures that may be imposed.

{¶ 12} On March 1, Dean Edmister sent a letter to plaintiff advising him that an interview with the investigative panel had been scheduled for March 22; that plaintiff could file a written response at least five days prior to the scheduled interview; and that Dean Edmister and university counsel would be present at the meeting. Dean Edmister also noted his understanding that plaintiff's attorney would attend the interview. (Joint Exhibit H.)

{¶ 13} On April 13, the investigative panel, composed of Drs. Merritt, Kowalski, and Chambers, sent a memo to Dean Edmister regarding its findings. The memo referenced the standards as set forth in the dean's February 7 letter to plaintiff. After an investigation, which included examining statements or correspondence from students who had been enrolled in any of plaintiff's spring semester classes, the discussion session with plaintiff on February 3, and the interview on March 22, the panel found that it was more likely than not that the important facts relating to the allegations did occur. The panel further found that it was more likely

than not that a reasonable student would have felt intimidated and threatened by plaintiff's comments.

{¶ 14} The panel also found that it was more likely than not that plaintiff's conduct violated the provisions in the academic charter regarding professional ethics and responsibilities; that plaintiff failed to maintain an atmosphere conducive to free inquiry and the respect of the student as an individual; and that his comments constituted a threat of violence as defined in the anti-violence policy. The panel sustained the allegations that were detailed in the February 7 letter, but noted that plaintiff had acknowledged that his remarks were inappropriate and unprofessional, that he regretted the incident, and that he was willing to apologize. (Joint Exhibit J.)

{¶ 15} On May 9, Dean Edmister sent plaintiff a letter wherein he stated that he accepted the factual findings of the investigating committee; that he concluded that plaintiff's actions violated the academic charter and the university's violence-free workplace policy; and that advised plaintiff that he was taking the "following remedial actions" which included his suspension from the university *without* pay from May 7, 2005, until January 1, 2006. Plaintiff was also required to participate in professional development classes regarding a violence-free workplace environment upon his return in 2006. Finally, Dean Edmister stated that pursuant to Part B-I.E of the academic charter, plaintiff had the right to file a grievance of his decision. (Joint Exhibit N.) On May 23, Dr. Edmister resigned as Dean of the College of Business.

{¶ 16} On June 14, Interim Dean Nancy Merritt sent plaintiff a letter which included a copy of the investigative panel's report to the dean

concerning the "student complaints filed against" him during the 2005 spring semester. In the letter, Dean Merritt notified plaintiff that inasmuch as the investigation had been completed, he was welcome to return to campus and to his office in the Business Administration Building. However, during the time of his suspension, plaintiff was not allowed to participate in any committees or department business; specifically, he did not have any voting privileges concerning the promotion and tenure candidates from the College of Business. (Joint Exhibit P.)

{¶ 17} On August 22, plaintiff sent a letter to Dr. Ben Muego, Chair of the Faculty Personnel and Conciliation Committee (FPCC), wherein he stated that he wished to initiate a grievance of the dean's decision in May 2005 to suspend his employment for the fall semester without pay. (Joint Exhibit Q.) On September 24, plaintiff suffered a stroke.

{¶ 18} On January 20, 2006, after having been granted extensions of time, plaintiff submitted a grievance petition to Dr. Muego, via his facilitator, Lawrence Daly, Professor of History. Over the objections of both Dr. Edmister and Dean Merritt as to the timeliness of plaintiff's grievance, the FPCC held a hearing on November 7, 2006. On November 15, 2006, a majority of the FPCC found that plaintiff had been denied due process when he was suspended from the university without pay; that the university's initial action of suspending him with pay until such time that an investigation could be conducted was warranted, but that the university's conclusion that plaintiff's in-class statement constituted a threat of violence was invalid; and, that the disciplinary action imposed from May 7, 2005, to January 1, 2006, was unwarranted. (Defendant's Exhibit EE.)

{¶ 19} On December 19, 2006, Dr. John Folkins, Provost and Vice President for Academic Affairs, issued a memorandum wherein he found that plaintiff's grievance did not meet the time limitations as outlined in the academic charter. He also found that the factual conclusions of the FPCC were not supported by the evidence. He further stated that he had been consulted when Dean Edmister made the decision to suspend plaintiff's employment for one semester without pay, and that he believed at the time that it was an appropriate action. He accepted the FPCC's recommendation regarding summer teaching assignments but stated that the other recommendations were not appropriate.[4] He further stated that his decision was the final administrative action of the university on the matter.

{¶ 20} Plaintiff asserts that defendant breached his employment contract when it suspended him without pay from May 7, 2005, to January 1, 2006, inasmuch as the academic charter does not provide for the unpaid suspension of a tenured faculty member. Plaintiff also asserts that defendant breached the contract when it failed to follow the disciplinary process described in the academic charter regarding threats of violence. Defendant argues that plaintiff breached his employment contract when he made a threat of violence, and that nothing in the academic charter prohibits a dean from suspending a tenured faculty member without pay for a reasonable amount of time as a sanction for violating the rules regarding threats of violence in the workplace.

---

[4]Both the FPCC and Dean Edmister agreed that any claim that plaintiff had with regard to summer teaching assignments in 2005 was without merit inasmuch as the nine-

{¶ 21} In order to prove breach of contract, plaintiff must prove the existence of a contract; performance by plaintiff; breach by defendant; and damages or loss as the result of the breach. *Samadder v. DMF of Ohio, Inc.*, 154 Ohio App.3d 770, 2003-Ohio-5340. The parties do not dispute that plaintiff's employment was governed by a written contract which was subject to the academic charter. The construction of written contracts is a matter of law. *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, paragraph one of the syllabus. The cardinal purpose for judicial examination of any written instrument is to ascertain and give effect to the intent of the parties. *Aultman Hosp. Assn. v. Community Mut. Ins. Co.* (1989), 46 Ohio St.3d 51. "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Kelly v. Medical Life Ins. Co.* (1987), 31 Ohio St.3d 130, paragraph one of the syllabus.

{¶ 22} "'A written contract with an explicit tenure provision clearly is evidence of a formal understanding that supports a teacher's claim of entitlement to continued employment unless 'sufficient cause' is shown.'" *Chan v. Miami University*, 73 Ohio St.3d 52, 59, 1995-Ohio-226, quoting *Perry v. Sindermann* (1972), 408 U.S. 593, 601. "Tenure has the status of a property right and may be deprived pursuant to constitutionally adequate procedures defined by the right itself." *Chan*, supra.

{¶ 23} In *Chan*, a tenured professor was accused of sexually harassing one of his students. The university terminated his employment pursuant to the contract provision prohibiting sexual harassment rather

---

month employment contracts for faculty members do not guarantee summer

than the contract provision regarding termination of tenured faculty. The Supreme Court of Ohio held that because the university terminated the professor's employment contract without complying with its express procedure for termination of tenured faculty, the university breached its contract with the professor and denied him due process of law.

{¶ 24} Defendant argues that the holding in *Chan* does not apply to this case because plaintiff's employment was not terminated and his tenure was not revoked. However, both plaintiff's pay and his voting privileges were suspended from May 7 to December 31. The court finds that defendant's actions, in effect, interfered with plaintiff's tenure rights.

{¶ 25} Section B-I.C.3.a), regarding tenure at defendant's university contains the following relevant language:

{¶ 26} "The tenure of a member of the faculty shall continue until one of the following occurs: death, resignation, retirement because of age or disability, discontinuance of the position as a consequence of a Universitywide financial exigency, termination of the appointment for adequate cause, or failure to accept within sixty days an assignment, to be made in writing, for the ensuing academic year of duties appropriate to the faculty member's professional training and experience." The court finds that none of these situations occurred in this matter, yet plaintiff's employment was "suspended." The court finds that there is no mention of the suspension of tenured faculty in the academic charter.

{¶ 27} Generally, trial courts are required to defer to the academic decisions of colleges and universities unless there has been such a

employment.

substantial departure from the accepted academic norms so as to demonstrate that the committee or person responsible did not actually exercise professional judgment. *Bleicher v. Univ. of Cincinnati College of Medicine* (1992), 78 Ohio App.3d 302, 308. The standard of review is not merely whether the court would have decided the matter differently but, rather, whether the faculty action was arbitrary and capricious. Id. See also *Bd. of Curators of Univ. of Mo. v. Horowitz* (1978), 435 U.S. 78, 91.

{¶ 28} Robert Edmister testified that he was not aware of any provision in the academic charter for a Dean or the Provost to suspend a tenured professor. However, he testified that he believed that he had the authority as the contracting officer to suspend plaintiff without pay.[5]

{¶ 29} Dr. John W. Folkins testified that he was provost and Vice President for Academic Affairs. According to Dr. Folkins, the contracting officers, or deans, are responsible for disciplining faculty. Dr. Folkins stated that he approved a suspension with pay in February because an investigation was pending. Dr. Folkins further testified that he approved the proposed suspension without pay after the investigation because he thought a suspension without pay was appropriate discipline.

{¶ 30} Nancy Merritt testified that after her initial meeting with plaintiff, she was part of the decision to remove him from campus because

---

[5]Article IX, Section C4 states that: "The Dean shall serve as chief personnel and contracting officer for the college. As such, the Dean shall review all departmental and school personnel recommendations concerning faculty and academic staff (i.e., recommendations for new appointments, reappointments, performance evaluations, salary changes, terminations of contracts, tenure, leaves of absence, and promotions) in accordance with the principles set forth in this Charter. *X, XI, XII, B-I.A, B, C, D, E, and F.* The Dean shall be responsible for forwarding personnel recommendations to the VPAA." (Emphasis in original.)

she considered his statements a threat of violence.  Merritt stated that she was worried that plaintiff would go back to class without having taken anger management training.

**{¶ 31}** Dr. Tim Chambers testified that there was no significant change in the number of students who attended plaintiff's classes from February 1 to February 3, after plaintiff had made the remarks.

**{¶ 32}** The academic charter contains the following language: "Section B-II.F. Ethical Responsibilities. 4. Policy on Violence.  It is the policy of Bowling Green State University that acts of violence, threats of violence, or intimidation will not be tolerated.  Bowling Green State University recognizes the importance of providing a safe environment for all its members.  In this community, victims/survivors will be treated with dignity and respect.  *Any persons found in violation of this policy may be subject to disciplinary action (B-II.F.3 and B-I.E)*.  Violators may also be subject to criminal prosecution."  (Emphasis added.)

**{¶ 33}** It is undisputed that no criminal charges were brought against plaintiff for his comments.  Section B-II.F.3 of the academic charter states in part:  "Equal Opportunity and Anti-Harassment Policies Bowling Green State University is committed to providing faculty, staff and students with an environment where they may pursue their careers or studies free from discrimination.  The Office of Equity, Diversity and Immigration Services is responsible for administering the University's Equal Opportunity and Anti-Harassment Policies.  The office exists, in part, to ensure that all members of the University community understand their responsibility to create and maintain an environment free from discrimination and harassment."

**{¶ 34}** Section B-I.E, entitled "Faculty Grievance Procedures" states, in part: "The Faculty Personnel and Conciliation Committee (FPCC) *IV.F.4* is empowered to resolve faculty grievances by a process of facilitation, conciliation, Board of Inquiry, Board of Appeal, or Direct Appeal to the VPAA, or President and culminating in a recommendation to the VPAA or the President. Since the grievance process is adversarial, it is preceded by a required attempt at conciliation. Faculty members with potential grievances are encouraged to seek resolution of them by whatever means are available before filing a grievance with the FPCC. The procedures for handling faculty potential grievances by the Faculty Senate's FPCC follow."[6]

---

[6]"1. Powers of FPCC

"The FPCC shall:

"a) consider grievances brought by faculty members concerning salary, retention, rank, tenure, *B-I.C.3.c)* and professional practices, *including grievances brought against individual faculty members* or administrators *as a result of alleged infractions of applicable policies*, procedures, rules, regulations or laws, relating to the operation of the University;

"b) *consider grievances brought by* a department Chair, a school Director, *a Dean*, the VPAA, or the President *against individual faculty members*; * * *

"2. Appointment of Facilitator

"a) After the Chair of FPCC is contacted by a faculty member who desires to file a grievance, the FPCC Executive Committee (FPCC-EC) *IV.F.4*, shall within five class days appoint a facilitator, who can be a current FPCC member;
"b) The facilitator shall explain the FPCC grievance and conciliation process to the grievant, shall assess and inform the grievant of the relative merit of the proposed grievance, shall assist the grievant in preparing the petition, and shall emphasize the importance of following time deadlines;

"c) The grievant may select the facilitator to become his or her advisor *B-I.E.2* or may select another faculty or administrative staff member.

**{¶ 35}** Upon review of the evidence, the court finds that defendant originally charged that plaintiff had violated the academic charter by making a threat of violence. The court finds that defendant acted reasonably and within its discretion when it suspended plaintiff with pay pending an investigation of such a charge.

**{¶ 36}** However, the court further finds that the academic charter does not provide for the unpaid suspension of a tenured professor's employment. Furthermore, the policy against workplace violence refers to two separate sections of the academic charter that are applicable when a violation of that policy has occurred: Sections B-II.F.3 and B-I.E. Section B-II.F.3 refers to instances where discrimination has been alleged, and the court finds that this section was not applicable to the facts in this case. Section B-I.E refers to the faculty grievance procedure, and it is undisputed that the faculty grievance procedure was not followed when discipline was imposed upon plaintiff for his comments. The court further finds that Dean Edmister, therefore, acted arbitrarily when he suspended plaintiff without pay from May 7 to December 31, 2005, inasmuch as such a sanction is not authorized by the academic charter. Although defendant asserts that plaintiff's tenure was not affected by the suspension, the court finds that the suspension was an unauthorized infringement on his tenure.

**{¶ 37}** Furthermore, defendant's expert, Eugene Deisinger, who serves as chief of police at Iowa State University, and a crisis intervention and threat assessment consultant, opined that plaintiff did not pose a risk of carrying out the specific threat. The court finds that Deisinger's testimony was credible. Moreover, the court finds that defendant's failure

---

"d)  The facilitator's role is concluded when the grievance petition is submitted to the Chair of FPCC and the Faculty Senate Office, or if the grievant decides not to continue the matter." (Emphasis added.)

to inquire whether plaintiff had enrolled or even attended anger management classes upon his return to campus in June, coupled with the fact that the attendance rate did not vary from plaintiff's February 1 to February 3 classes, calls into question defendant's contention that it believed that plaintiff posed a serious threat of harm. The court finds that defendant's initial reasonable response to the situation escalated into an arbitrary punishment for plaintiff's one-time lapse in judgment.

{¶ 38} For the foregoing reasons, the court finds that plaintiff has proven by a preponderance of the evidence that defendant breached his employment contract by imposing an unpaid suspension that was not authorized by the academic charter, and that the disciplinary measures as outlined in the policy prohibiting workplace violence were not followed. Therefore, judgment shall be rendered in favor of plaintiff.

Court of Claims of Ohio

The Ohio Judicial Center

65 South Front Street, Third Floor

Columbus, OH 43215

614.387.9800 or 1.800.824.8263

www.cco.state.oh.us

NORMAN I. ECKEL, Ph.D.

    Plaintiff

v.

BOWLING GREEN STATE UNIVERSITY

Defendant
Case No. 2007-02815

Judge Clark B. Weaver Sr.

JUDGMENT ENTRY

This case was tried to the court on the issue of liability.  The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of plaintiff.  The case will be set for trial on the issue of damages.

_____

CLARK B. WEAVER SR.
Judge

cc:

R. J. Lydy

4930 Holland-Sylvania Road

Sylvania, Ohio 43560-2149

Velda K. Hofacker

Assistant Attorney General

150 East Gay Street, 18th Floor

Columbus, Ohio 43215-3130

HTS/cmd

Filed June 11, 2010

To S.C. reporter July 7, 2010