OPINION
{¶ 1} Defendant-appellant, Raelene Westfall, appeals from a Jefferson County Juvenile Court decision awarding custody of her children to their father, plaintiff-appellee, Jerry Francis.
 {¶ 2} Appellant and appellee share two children, Corey (d.o.b. 6/27/1990) and Cody (d.o.b. 1/30/1992). The parties primarily resided together for approximately 14 years until appellant moved with the children to her parents' home in August of 2002. On January 23, 2003, appellee filed separate complaints for custody of each of the boys in juvenile court. Shortly thereafter, the court put on a temporary support and visitation order.
 {¶ 3} A magistrate held a two-day hearing on appellee's complaints. The magistrate listened to testimony from both parties and various other witnesses and interviewed the children in chambers. He then entered identical decisions in the two cases finding in favor of appellant. Appellee filed objections to the magistrate's decision alleging that the magistrate ignored certain testimony and made several findings that were not supported by the evidence. The trial court held a hearing on appellee's objections. In identical judgment entries, the court sustained appellee's objections and found that it was in the children's best interests that it grant custody to appellee.
 {¶ 4} Appellant filed timely notices of appeal on July 18, 2003 in both cases. For purposes of appeal, this court consolidated the two cases.
 {¶ 5} Appellant raises two assignments of error, the first of which states:
 {¶ 6} "The trial court erred when it sustained appellee's objections when there was no record of the in-chambers interview with the children."
 {¶ 7} Appellant argues that because appellee failed to request a transcript of the children's in-chamber interviews with the magistrate, the trial court could not rely on these interviews in rendering its decision. Citing, Civ.R. 53(E)(3)(c). She asserts that the docket is silent as to the existence and sealing of the in-chamber interviews.
 {¶ 8} When a party files objections to a magistrate's decision, he or she must follow the procedures set out in Civ.R. 53(E)(3). Civ.R. 53(E)(3)(c) provides in part, "[a]ny objection to a finding of fact shall be supported by a transcript of all the evidence submitted to the magistrate relevant to that fact or an affidavit of that evidence if a transcript is not available."
 {¶ 9} On May 23, 2003, the same day he filed his objections to the magistrate's decision, appellee filed a praecipe for a transcript of the testimony before the magistrate. The request simply stated, "[p]lease prepare a transcript of the testimony before the Magistrate, which commenced on May 1, 2003 and terminated on May 7, 2003." It made no reference to the in-chamber interviews, which the magistrate was to conduct several days after the hearing commenced. (5/7/2003 Tr. 140-41). The hearing transcripts were filed in the trial court on June 20, 2003.
 {¶ 10} The children's in-chamber interviews are located in the record, though not certified, file-stamped, or recorded on the docket sheet. Interestingly, the only exhibit entered in the magistrate's hearing, Plaintiff's Exhibit 1 consisting of 14 photographs, was located in the envelope containing Corey's interview. This envelope was stapled to the inside cover in the record of Corey's case. Cody's interview transcript was also inside an envelope, which was two-hole punched and included in the record of his case. An examination of the envelopes reveals that they were once sealed and have been opened, presumably by the trial court.
 {¶ 11} Given the fact that the interview transcripts are not certified, file-stamped, or recorded on the docket sheet, it was error for the trial court to consider them. We have no way of knowing who transcribed the interviews or how they found their way into the record. However, the court's error may have been harmless if the transcripts of the magistrate's hearing provide sufficient evidence to support the court's judgment.
 {¶ 12} A trial court's decision regarding the custody of a child which is supported by competent and credible evidence will not be reversed absent an abuse of discretion. Booth v. Booth
(1989), 44 Ohio St.3d 142, syllabus. Abuse of discretion connotes more than an error in law or judgment; it implies that the court's attitude was unreasonable, arbitrary, or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 13} While the parties in this case lived as a family for some time, they never married. Furthermore, no court had ever issued an order designating one or the other as the boys' residential parent. R.C. 3109.042 provides:
 {¶ 14} "An unmarried female who gives birth to a child is the sole residential parent and legal custodian of the child until a court of competent jurisdiction issues an order designating another person as the residential parent and legal custodian. A court designating the residential parent and legal custodian of a child described in this section shall treat the mother and father as standing upon an equality when making the designation."
 {¶ 15} Thus, upon appellee's filing of the motions for custody, the parties stood on equal footing before the trial court as to who should be named the residential parent.
 {¶ 16} According to R.C. 3109.04(B)(1), the court must determine the children's best interests for the purposes of ordering an original allocation of parental rights and responsibilities. The best interest standard applies in initial actions to allocate parental rights in cases involving children of unmarried parents as well as in the context of divorce, dissolution, or annulment. In re Custody of Shepherd (Mar. 19, 1999), 4th Dist. No. 98 CA 2586; Anthony v. Wolfram (Sept. 29, 1999), 9th Dist. No. 98CA007129. In determining the children's best interests, R.C. 3109.04(F)(1) requires the court to consider all relevant factors, including, but not limited to:
 {¶ 17} "(a) The wishes of the child's parents regarding the child's care;
 {¶ 18} "(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;
 {¶ 19} "(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
 {¶ 20} "(d) The child's adjustment to the child's home, school, and community;
 {¶ 21} "(e) The mental and physical health of all persons involved in the situation;
 {¶ 22} "(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;
 {¶ 23} "(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;
 {¶ 24} "(h) Whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in * * * [child abuse, child neglect, or domestic violence];
 {¶ 25} "(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;
 {¶ 26} "(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state." R.C. 3109.04(F)(1).
 {¶ 27} The evidence reveals the following regarding the best interest factors.
 {¶ 28} As to the parents' wishes, both parents wish to be the boys' residential parent.
 {¶ 29} Next, the magistrate interviewed the boys. As indicated previously, we have uncertified transcripts of the boys' interviews in the record. This court will not consider transcripts that are not properly certified and entered in the record.
 {¶ 30} The parties elicited some testimony regarding the boys' interaction with others. As to interaction with their maternal grandparents, several witnesses testified that the grandparents may be abusive. Appellee testified that the grandparents are verbally and physically abusive to the boys. (5/1/2003 Tr. 12, 15, 19-20). Susan Arlotta, the boys' guidance counselor, testified that Cody came to see her one day and had a scratch on his chest, which he said his grandmother gave him. (5/1/2003 Tr. 73). Janet Akens, appellant's neighbor, testified that the boys came to her house because their grandfather had hit one of them with a baseball glove, left a red mark on his face, and told the boys to get out of his house. (5/1/2003 Tr. 110-12). Appellant, however, testified that the boys get along well with their grandparents, "but they — they have their moments." (5/7/2003 Tr. 21).
 {¶ 31} Next, Ms. Arlotta testified about the boys' adjustment at school. She began seeing the boys at the beginning of the 2002-2003 school year. (5/1/2003 Tr. 69). She stated that the boys were upset that their parents were no longer together. (5/1/2003 Tr. 69). She also testified that Corey's grades dropped and appellee made an appointment to come in and discuss that problem. (5/1/2003 Tr. 70-71). And she testified that Cody had been acting up in the classroom. (5/1/2003 Tr. 74-75).
 {¶ 32} No testimony was provided as to any mental or physical health issues.
 {¶ 33} As to visitation issues, appellee testified that appellant was not allowing the children to have telephone access to him as set forth in the court order. (5/1/2003 Tr. 21). He stated that he bought the boys cell phones so they could call him because they were not permitted to use the house phone at their grandparents' house. (5/1/2003 Tr. 21). He also stated that the boys have gone to a neighbor's house to call him. (5/1/2003 Tr. 25). Ms. Akens, appellant's neighbor, corroborated this testimony, stating that the boys have come to her house to use the phone to call appellee. (5/1/2003 Tr. 109). Appellant denied these allegations stating that the boys have frequent phone contact with appellee. (5/7/2003 Tr. 25-27). And she stated that she took the boys' cell phones away because appellee called too late at night. (5/7/2003 Tr. 37). Additionally, appellee testified that he has been able to exercise his visitation with the boys. (5/1/2003 Tr. 25).
 {¶ 34} As to child support, a temporary order of support was entered for appellee to pay $50 per month per child. There was no testimony that appellee was not current in making these payments. However, the court made that order when appellee was unemployed. Since then, appellee gained employment and failed to notify CSEA of his employment. (5/1/2003 Tr. 33).
 {¶ 35} There was no testimony that either parent was ever convicted of any child abuse, neglect, or domestic violence acts. Nor was there any testimony that either parent has ever continuously and willfully denied parenting time. And there was no indication that either parent is planning to move out of Ohio.
 {¶ 36} In addition to the best interest factors, the parties presented other relevant evidence as follows.
 {¶ 37} Appellee presented evidence of appellant's social habits. He testified that appellant drinks every day and that she stays out late at bars. (5/1/2003 Tr. 11, 14). Ms. Arlotta testified that Cody expressed that he was upset that appellant went out drinking. (5/1/2003 Tr. 75). And Billie Jo Judson, appellee's niece, testified that for a month the parties lived with her and appellant drank almost every day. (5/1/2003 Tr. 116-17). Appellant denied these allegations. She testified that she only drinks once or twice a week and no more than five beers at a sitting. (5/7/2003 Tr. 13). She stated that she only leaves to go out to the bars after she puts the boys to bed and that her parents are there with them when she goes out. (5/7/2003 Tr. 14). Ezra Westfall, appellant's brother testified that he goes out a couple times a week with appellant to bars. (5/7/2003 Tr. 69). He stated that sometimes she drinks beer and other times she drinks pop. (5/7/2003 Tr. 69-70). And Ray Scalise, appellant's boyfriend, testified that he and appellant go out two or three times a week. (5/7/2003 Tr. 135).
 {¶ 38} Additionally, appellant testified that while she and appellee lived together, appellee drank and smoked marijuana. (5/7/2003 Tr. 33). Appellee denied this, stating that he has never had an alcohol or drug problem. (5/1/2003 Tr. 11).
 {¶ 39} In addition to the parties' social habits, some testimony was elicited that the boys wished to live with appellee. Appellant testified that, at times, she got the impression that the boys wanted to live with appellee. (5/7/2003 Tr. 56). And Ms. Arlotta testified that Cody had come to her crying about how he was not happy where he was living. (5/1/2003 Tr. 71).
 {¶ 40} Furthermore, appellant attempted to demonstrate that appellee was a violent person. She testified regarding an incident in a bar where appellee put her in a headlock and pulled her hair because she was out drinking. (5/7/2003 Tr. 10-12). Appellant's friend, Kathryn Harding, corroborated this incident. (5/7/2003 Tr. 84). Appellant also testified that appellee threatened her, although she could not give any specific examples. (5/7/2003 Tr. 12-13).
 {¶ 41} Additionally, appellant testified that while she and appellee were together, she was the one who primarily cared for the boys. (5/7/2003 Tr. 16-17). She stated that appellee only began acting as a good father since he initiated these proceedings. (5/7/2003 Tr. 16). She also stated that she was the primary breadwinner for the family. (5/7/2003 Tr. 17). Additionally, appellant stated that while she is at work, her parents care for the boys. (5/7/2003 Tr. 19-20).
 {¶ 42} As to appellant, appellee testified that appellant was "okay with the kids." (5/1/2003 Tr. 10). He testified that he tells the boys to respect their mother. (5/1/2003 Tr. 64). He also testified he contacts the boys' school about them. (5/1/2003 Tr. 13). Appellee stated he has gone to the school and met with teachers about Corey's declining grades. (5/1/2003 Tr. 22-23). Ms. Arlotta confirmed this testimony. (5/1/2003 Tr. 70-71). Additionally, appellee submitted 14 photographs of his trailer home showing the living areas, the front yard, and the boys' bedroom. (Plaintiff's Exh. 1). He stated if he had custody of the boys, his sister and niece would be available to watch them while he was at work. (5/1/2003 Tr. 30). Appellee's sister, Judy Creamer, corroborated this statement. (5/1/2003 Tr. 125).
 {¶ 43} Finally, witnesses provided testimony regarding the family's contact with Children's Services. Apparently, the boys have called Children's Services before. Appellee testified that they did so after an incident where appellant's mother "put her hands on them." (5/1/2003 Tr. 12). Ms. Arlotta testified that she called Children's Services when Cody came to school with a scratch that he indicated his grandmother inflicted on him. (5/1/2003 Tr. 73-74). Ms. Akens testified that she called the sheriff's department when the boys came to her house crying because one of the boys said his grandfather hit him in the face with a baseball glove. (5/1/2003 Tr. 110-12). Mary Ann Curfman, the Children's Services caseworker, testified that she received a call from someone stating that one of the boys threatened to shoot his grandmother. (5/1/2003 Tr. 89). She stated that she went to the boys' school and spoke with them. (5/1/2003 Tr. 89). She found that the boys were not a threat to their grandparents, but were very sad and upset. (5/1/2003 Tr. 89). She stated that she arranged to meet with appellant and her parents to discuss the situation, and that while appellant was cooperative, the grandparents minimized the situation and were not receptive to what she said. (5/1/2003 Tr. 90-91). She also stated that she contemplated removing the boys from the grandparents' home because she was concerned with threats they made to the boys, such as if they called Children's Services again they would knock their teeth out. (5/1/2003 Tr. 103).
 {¶ 44} Given all the testimony, and the presumption that the court is to view both parents on equal ground when awarding custody, the trial court did not abuse its discretion in awarding custody to appellee. We defer to the trial court's discretion in this matter, as the trial court did not act in an unreasonable, arbitrary, or unconscionable manner. Accordingly, while the court erred in reviewing the uncertified transcripts, this error does not warrant reversal since the court's decision is supported by competent, credible evidence properly on the record.
 {¶ 45} Appellant's second assignment of error states:
 {¶ 46} "The trial court erred by abusing its discretion when it based its decision relying on notes that either did not exist or were not part of the record."
 {¶ 47} The trial court's judgment entry states that the court reviewed the notes of the interview with the children. A review of the record reveals that no notes are included in the record, officially or unofficially. Appellant asserts it was error for the court to consider these mysterious notes.
 {¶ 48} The trial court's judgment entry states in part:
 {¶ 49} "The Court has reviewed the Magistrate's decision, the objection of the Plaintiff, the transcript and the notes of the interview with the child, and Section 3109.04 of the Ohio Revised Code."
 {¶ 50} What the court likely meant in stating that it considered the notes of the interview with the child, was that it reviewed the uncertified transcripts of the children's interviews. When it stated that it reviewed the transcript, it likely was referring to the certified transcript of the proceedings. Given that no notes could be located, this is the most likely scenario. And as stated above, although the court erred in considering the uncertified transcripts of the in-chamber interviews, the court did not abuse its discretion in granting appellee custody of the boys. Accordingly, appellant's second assignment of error is without merit.
 {¶ 51} For the reasons stated above, the trial court's decision is hereby affirmed.
Vukovich, J., concurs.
Waite, P.J., concurs.