OPINION
{¶ 1} Appellant Nicole Bell is the natural parent of minor child Sequoia Bell. In this appeal she contends that the Noble County Court of Common Pleas, Juvenile Division, should have returned legal custody of Sequoia to her. Legal custody of the child had been transferred to the maternal grandmother, Julie Bell ("Appellee"), by order of the Cuyahoga County Court of Common Pleas on December 7, 1992. This case was later transferred to Noble County. Appellant filed a motion for the reallocation of parental rights on May 28, 2004. After a hearing, the trial court overruled Appellant's motion for reallocation of parental rights on August 3, 2004, and it is this judgment entry that forms the basis of the instant appeal. The juvenile court's judgment entry does not discuss the best interests of the child, and there is no indication of the factors the court used in overruling Appellant's motion. Therefore, the matter is reversed and remanded for the trial court to determine the best interests of the child and to more fully explain its judgment.
 BACKGROUND {¶ 2} Sequoia was born on January 6, 1992. The natural father has had no contact with the child and is not a party to this appeal. The record reflects that a complaint in dependency was filed with the Cuyahoga County Court of Common Pleas, Juvenile Division, on March 30, 1992. The child was placed in the temporary custody of Appellee, the child's maternal grandmother. The complaint was amended on May 1, 1992, to reflect an additional application to determine custody. Hearings were held on March 30th, May 1st, May 26th, and December 7th of 1992. On December 7, 1992, the court modified its prior order and granted legal custody of the child to Appellee. There is no indication that the court ever ruled on the dependency complaint.
 {¶ 3} From the record now before us, there appears to have been no activity in this matter from December of 1992 until August, 2003.
 {¶ 4} On August 8, 2003, Appellant filed a motion with the Cuyahoga County Court of Common Pleas, Juvenile Division, to establish a parenting time schedule. Appellant also filed a motion to transfer venue of the case because Appellee and Sequoia had moved to Senecaville in Noble County. Appellant also noted that her mother had legal custody of Appellant's three other children and that the Noble County Juvenile Court had jurisdiction over these children. The motion to transfer venue to Noble County was granted on September 9, 2003, and this judgment entry has not been challenged by any of the parties in this case.
 {¶ 5} A pretrial hearing was held on March 31, 2004, and a temporary visitation schedule was set. The court ordered that Appellant would have visitation every other weekend from 6:00 p.m. on Friday until 7:00 p.m. on Sunday. (4/5/04 J.E.) Appellant continued to reside in Cleveland, and the court ordered that the exchange of the child would occur in Cambridge, Ohio, apparently to coordinate with the visitation schedule for Appellant's other children. The court also ordered that Appellant would have telephone access to Sequoia every Wednesday from 7:00 p.m. to 9:00 p.m.
 {¶ 6} On May 28, 2004, Appellant filed a motion seeking contempt against Julie Bell for failure to allow telephone contact on Wednesdays. Within that motion, Appellant also requested a reallocation of parental rights, asking that she be designated as the residential parent and legal custodian of Sequoia.
 {¶ 7} A hearing was held on June 4, 2004. Three witnesses testified. One of the witnesses was Dan Schwieterman, Sequoia's school guidance counselor. He testified that Appellant was living in a three-bedroom home in Cleveland with Attorney Kevin McFaul, in a middle-class neighborhood. (6/4/04 Tr., p. 3.) The second witness was Attorney McFaul, who testified that he had known Appellant for ten years, and that they moved in together in May of 2003. (6/4/04 Tr., p. 20.) He testified that Appellant entered a drug rehabilitation program in April of 2003. (6/4/04 Tr., p. 20.) James Bitterman of the Cuyahoga County Sheriff's Office also testified at the hearing. He described Appellant's home in Cleveland as "very nice" and stated that he saw Sequoia there four or five times. (6/4/04 Tr., pp. 3-4.) He also testified that Appellant and Attorney McFaul were both in a 12-step addiction recovery program. (6/4/04 Tr., pp. 4-5.)
 {¶ 8} The hearing was recessed, and the parties notified the court that they had reached an agreement over visitation for the summer. The hearing was resumed on July 23, 2004. Appellant and Julie Bell both testified at the continued hearing. The court also heard testimony from Appellant's chemical dependency counselor, a counselor for Sequoia, and a social worker.
 {¶ 9} Marge Tharpe, a counselor for Sequoia, testified as follows:
 {¶ 10} "Sequoia was perfectly content with her grandmother. Her grandmother was her mother figure and had been. It was her security. It's who she related to. It's who she understood as her mother. That her mother was Nicole, she thought she was pretty. She would tell me things about her but her mother wasn't a strong connection in her life. There wasn't a lot of interaction. There wasn't a lot of ongoing visitation and that changed when the boys entered the home and changed her position. And that changed more so in the last few months since the fight for the custody or not so much the fight for the custody but the fight for the visitation. * * * But Sequoia talked about how much fun she had at her moms. But that it wasn't all fun. She talked about how much she missed her grandmother, how much she loved her grandmother." (7/23/04 Tr., pp. 34-35.)
 {¶ 11} Ms. Tharpe recommended that Appellant, her mother, and the children enter counseling together to deal with the multitude of problems stemming from Appellant's substance abuse, from the children being taken from their mother, from the reintroduction of visitation, and from the animosity between Appellant and Julie Bell. Ms. Tharpe testified that Appellant had to deal with her own drug dependency before attempting to incorporate her children back into her life:
 {¶ 12} "But recovery has to be solid. Recovery has to be there. Recovery has to be evident before kids can come back into the picture and that I feel very strongly about in any family situation. You can't have kids and deal with kids [sic] problems until you've deal with adult problems and that's the bottom line." (7/23/04 Tr., p. 38.)
 {¶ 13} Ms. Tharpe also testified that Appellant's visits with Sequoia, "throughout her childhood had been erratic, occasionally, not consistent." (7/23/04 Tr., p. 42.)
 {¶ 14} A social worker, Louise Smith, testified that Sequoia and Julie Bell have a very close and affectionate relationship. (7/23/04 Tr., p. 53.)
 {¶ 15} Julie Bell testified that she was 53 years old, and lived in Cleveland from age 14 until the year 2000, when she moved to Noble County. She stated that she has had legal custody of Sequoia since March of 1992. Appellant left home at that time, at age 17, and did not return for several years. (7/23/04 Tr., p. 57.) Appellant did not remain in contact with Sequoia after she left home. Appellant later returned to Julie Bell's home for six months, but then left for another two years.
 {¶ 16} Julie Bell testified that Appellant did not come to Noble County to visit Sequoia between the years 2000-2003, but that Ms. Bell drove to Cleveland one weekend per month for visitation. (7/23/04 Tr., p. 61.) She testified that Appellant moved in with her in Noble County from approximately January through March of 2003. (7/23/04 Tr., p. 58.) Appellant then returned to Cleveland, and no fixed visitation schedule was set up. She testified that she never prevented Appellant from seeing Sequoia, or from talking to Sequoia on the phone. (7/23/04 Tr., pp. 61-64.) She testified that Sequoia and the other children have attitude and behavior problems after their visits with Appellant. (7/23/04 Tr., p. 65.)
 {¶ 17} Julie Bell testified that she wants to continue her custody of Sequoia and that she and Appellant should go into counseling together. (7/23/04 Tr., pp. 64-65.) She stated that she does not get along well with Appellant. Immediately after this, Appellant interrupted Julie Bell's testimony, and the court threatened to call the sheriff to deal with Appellant's outbursts in the courtroom. (7/23/04 Tr., p. 66.)
 {¶ 18} Appellant testified that she was addicted to heroin for two years, and that she entered rehabilitation in March or April of 2003. (7/23/04 Tr., pp. 2-3.) This program lasted eight weeks, and after which she entered into a drug counseling program for 23 weeks. (7/23/04 Tr., p. 3.) She testified that she was addicted to heroin when she lived with her mother. (7/23/04 Tr., p. 4.)
 {¶ 19} Appellant testified that her mother prevented any visitation from occurring after June 15, 2003. (7/23/04 Tr., p. 5.) It was Julie Bell's interference with visitation that prompted Appellant to file her motion for visitation rights. Appellant's next successful attempt at visitation with Sequoia was Easter weekend in 2004. (7/23/04 Tr., p. 6.) She testified that she never missed a visit with Sequoia once the court established visitation rights, at least when Appellee would allow visitation to occur. (7/23/04 Tr., p. 12.)
 {¶ 20} Appellant testified that she was not permitted to speak with Sequoia on the phone, even though the court had ordered phone visitation every Wednesday. (7/23/04 Tr., p. 7.) She testified that her mother destroyed all the photographs she had of Appellant; that her mother told Sequoia that Appellant was dead; and that her mother once called the Cleveland police from Noble County and told them that Sequoia was locked in a room. (7/23/04 Tr., pp. 8-9.)
 {¶ 21} Appellant testified that she was in a stable four-year relationship with her boyfriend, Kevin McFaul. (7/23/04 Tr., p. 2.) She testified that she and Kevin live in a house in Cleveland, and that she plans on having Sequoia move there and attend a Catholic school in the area.
 {¶ 22} Appellant testified that she voluntarily received treatment for her substance abuse problems and was continuing in treatment well beyond the required time periods. (7/23/04 Tr., p. 3.)
 {¶ 23} Appellant agreed that all the parties in this case need counseling, especially to resolve their distrust and anger issues. (7/23/04 Tr., p. 19.)
 {¶ 24} Nancy Braham, who was Appellant's drug counselor, testified that Appellant attended drug rehabilitation and counseling, and was very faithful in her commitment to the program. (7/23/04 Tr., p. 23.) Braham also stated that Appellant was a capable and excellent parent. (7/23/04 Tr., p. 25.) She recommended continued counseling for the entire family based on a variety of ongoing emotional problems. (7/23/04 Tr., pp. 25ff.)
 {¶ 25} The trial court filed its judgment on August 3, 2004. The trial court overruled Appellant's motion for the reallocation of parental rights, stating only that "Nicole Bell has failed to meet her burden of proof[.]" This timely appeal was filed on September 1, 2004. There was some delay in processing this appeal because Appellee's attorney withdrew from the case during the appeal, and her new counsel was not provided with all the necessary information to respond to the errors raised by Appellant. Appellee was then given additional time to prepare a responsive brief.
 ASSIGNMENT OF ERROR {¶ 26} Appellant's sole assignment of error states:
 {¶ 27} "THE TRIAL COURT'S DENIAL OF APPELLANT'S MOTION FOR REALLOCATION OF PARENTAL RIGHTS AND RESPONSIBILITIES IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 28} Appellant argues generally that she is a fit parent, that a change of custody would be in Sequoia's best interests, and that the benefits of a change of custody outweigh the disadvantages. Appellant presents very little legal analysis, except for a brief citation of the manifest weight of the evidence standard of review. Appellant's argument is basically that this Court should view the evidence in her favor and grant her motion to regain custody of Sequoia.
 {¶ 29} This case involves a request for modification of parental rights and responsibilities from a juvenile court, and as such, has its own specific standards of review. This case originally arose in 1992 as a dependency proceeding, and was then converted into a custody proceeding under R.C. § 2151.23(A)(2), which states:
 {¶ 30} "(A) The juvenile court has exclusive original jurisdiction under the Revised Code as follows:
 {¶ 31} "* * *
 {¶ 32} "(2) Subject to divisions (G) and (V) of section2301.03 of the Revised Code, to determine the custody of any child not a ward of another court of this state;"
 {¶ 33} The Cuyahoga County Court of Common Pleas, Juvenile Division, did not rule on the dependency complaint, and awarded legal custody to Julie Bell pursuant to R.C. § 2151.23(A).
 {¶ 34} "Legal custody" is defined in R.C. § 2151.011(B)(19):
 {¶ 35} "(19) `Legal custody' means a legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities. An individual granted legal custody shall exercise the rights and responsibilities personally unless otherwise authorized by any section of the Revised Code or by the court."
 {¶ 36} When a parent loses legal custody of a child, the parent retains certain residual parental rights, such as the right of visitation and the right to determine the child's religion. In re Nice (2001), 141 Ohio App.3d 445, 455,751 N.E.2d 552. The parent also retains the right to request a return of legal custody in the future. Id.
 {¶ 37} In May 2004, Appellant filed a motion to be restored as the legal custodian of Sequoia. A motion to regain legal custody causes a trial court to make a determination of the child's best interests. In re Hockstok, 98 Ohio St.3d 238,2002-Ohio-7208, 781 N.E.2d 971, at ¶ 38. Hockstok arose as a juvenile court case under R.C. § 2151.23(A), and thus, applies to the custody rulings in the instant case. There are no statutory standards set forth for determining the best interests of the child in cases arising out of R.C. § 2151.23(A), in contrast to the very detailed list of best interests factors contained in R.C. § 3109.04(F) applicable to divorce proceedings. Nevertheless, the Ohio Supreme Court has held that the best interests standard is the appropriate standard for the juvenile court to apply in a proceeding to modify legal custody:
 {¶ 38} "[A]fter the legal custody determination is made, the best-interest-of-the-child standard should be used for any custody modification petitions filed by a natural parent. * * * After such a determination has established, or taken away, a parent's fundamental custodial rights, the focus must shift from the rights of the parents to the rights of the child. A child's rights are effectuated through the use of the best-interest-of-the-child standard for subsequent custodial modification requests." Hockstok at ¶ 38, 781 N.E.2d 971.
 {¶ 39} A decision regarding custody of a child will not be reversed absent an abuse of discretion. Davis v. Flickinger
(1997), 77 Ohio St.3d 415, 416-417, 674 N.E.2d 1159; Miller v.Miller (1988), 37 Ohio St.3d 71, 523 N.E.2d 846. In order to find an abuse of discretion, the reviewing court must determine that the trial court's decision was unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983) 5 Ohio St.3d 217,450 N.E.2d 1140. If the trial court's decision concerning the child's best interests is not supported by competent, credible evidence, then it is unreasonable and may be reversed. Nice,
supra, at 455. The trial court, rather than the reviewing court, is in the best position to weigh the testimony and observe the witnesses' demeanor in order to gauge their credibility. In reJane Doe 1 (1991), 57 Ohio St.3d 135, 138, 566 N.E.2d 1181.
 {¶ 40} Before analyzing the facts of this case in light of the aforementioned standard of review, we sua sponte review the preliminary matter as to whether Appellant has previously been determined to be an unsuitable parent, and whether this case should be reviewed under a more stringent standard than what has been outlined above. This question arises because the record we have received from the Cuyahoga County Court of Common Pleas does not clearly indicate that Appellant was ever designated as an unsuitable parent prior to the award of custody of the child to the maternal grandmother. In custody disputes between a parent and nonparent, the court is generally required to determine that the parent is unsuitable prior to transferring custody to the nonparent. Hockstok, supra, at syllabus. We recognize that this issue has not been raised or briefed by the parties. Nevertheless, the matter may involve a jurisdictional issue that can be raised sua sponte by this Court, and also forms part of the analysis of Hockstok, cited earlier in our discussion of the standard of review in this case.
 {¶ 41} Hockstok itself continues a discussion begun in Inre Perales (1977), 52 Ohio St.2d 89, 369 N.E.2d 1047, one of the seminal cases dealing with custody disputes between a natural parent and a nonparent. Perales set forth the parameters of the parental unsuitability test:
 {¶ 42} "In an R.C. 2151.23(A)(2) child custody proceeding between a parent and a nonparent, the hearing officer may not award custody to the nonparent without first making a finding of parental unsuitability — that is, without first determining that a preponderance of the evidence shows that the parent abandoned the child, that the parent contractually relinquished custody of the child, that the parent has become totally incapable of supporting or caring for the child, or that an award of custody to the parent would be detrimental to the child." Id. at syllabus.
 {¶ 43} Hockstok reaffirmed the analysis set forth inPerales. Hockstok repeated many of the basic principles that govern all custody disputes between parents and nonparents:
 {¶ 44} "Within the framework of the statutes, the overriding principle in custody cases between a parent and nonparent is that natural parents have a fundamental liberty interest in the care, custody, and management of their children. Santosky v. Kramer
(1982), 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599; In reMurray (1990), 52 Ohio St.3d 155, 157, 556 N.E.2d 1169. This interest is protected by the Due Process Clause of theFourteenth Amendment to the United States Constitution and by Section 16, Article I of the Ohio Constitution; Santosky, supra; In reShaeffer Children (1993), 85 Ohio App.3d 683, 689-690,621 N.E.2d 426. Since parents have constitutional custodial rights, any action by the state that affects this parental right, such as granting custody of a child to a nonparent, must be conducted pursuant to procedures that are fundamentally fair. Santosky v.Kramer, 455 U.S. at 754, 102 S.Ct. 1388, 71 L.Ed.2d 599; In reAdoption of Mays (1986), 30 Ohio App.3d 195, 198, 30 OBR 338,507 N.E.2d 453." Hockstok at ¶ 16.
 {¶ 45} Hockstok also held:
 {¶ 46} "In a child custody case arising out of a parentage action between a natural parent of the child and a nonparent, a trial court must make a parental unsuitability determination on the record before awarding legal custody of the child to the nonparent." Id. at syllabus.
 {¶ 47} One of the key issues in Hockstok was whether the record reflected a constructive unsuitability determination because the parents had failed to file an appeal of the judgment entry granting legal custody to the maternal grandparents. Normally, the failure to file a timely appeal constitutes a waiver of issues that could have been raised in that appeal. Inre Appropriation for 1979 (1980), 62 Ohio St.2d 99, 101, 16 O.O.3d 104, 403 N.E.2d 974. Approximately ten months after custody was transferred to the grandparents, the parents filed a motion to regain custody. Hockstok ruled that the parents' failure to file an appeal of the judgment entry transferring custody, followed ten months later by a motion to reallocate parental rights, did not constitute a constructive forfeiture of parental rights. Id. at ¶ 31-32. It was in this context thatHockstok concluded, "that in custody cases between a natural parent and nonparent, a parental unsuitability determination must be made and appear in the record before custody can be awarded to a nonparent." Id. at ¶ 36.
 {¶ 48} It would appear that the situation in Hockstok may be distinguished from the facts of the instant appeal for a number of reasons. First and foremost, Appellant has not raised the "suitability" question on appeal. In fact, at oral argument in this appeal, Appellant's counsel admitted that the issue of unsuitability had been previously determined and was not an issue in this appeal. This is in stark contrast to the Hockstok case, in which the parents properly and persistently raised the suitability issue at the trial court level and on appeal, except for the single appeal that they failed to file. It is evident from the caselaw dealing with this issue that a parent's right to a suitability hearing and determination is a due process right, and that due process rights must be asserted by the party attempting to obtain the benefit of those rights. See, e.g., Inre Etter, (1998), 134 Ohio App.3d 484, 731 N.E.2d 694.Hockstok itself noted that the custodial rights of parents are, "protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and by Section 16, Article I of the Ohio Constitution[.]" Hockstok, 98 Ohio St.3d 238,2002-Ohio-7208, at ¶ 16. A due process right is not a jurisdictional matter that might somehow prevent us from accepting Appellant's assignment of error for review. Unlike jurisdictional requirements, due process rights may be affirmatively waived at trial as well as on appeal. Chan v.Miami Univ. (1995), 73 Ohio St.3d 52, 63-64, 652 N.E.2d 644;Black v. State Bd. Of Psychology, 160 Ohio App.3d 91,2005-Ohio-1449, 825 N.E.2d 1192.
 {¶ 49} In Hockstok the Ohio Supreme Court considered whether the parental unsuitability issue was constructively waived due to the failure to file a timely appeal of a crucial judgment entry. Hockstok did not consider whether a parent may affirmatively waive the right to a suitability hearing. In the instant case, Appellant has actively, not constructively, waived her right to clarify the record concerning the parental unsuitability. At the July 23, 2004, custody hearing, Appellant's attorney actually discussed In re Perales, but never asked for a suitability determination. In fact, the attorney conceded that Appellant was not a suitable parent at the time her mother was granted legal custody in 1992:
 {¶ 50} "The issue that we have here and following the line of cases after In re: Pyralis [sic; counsel is referring toPerales] which speaks about the right of parents to the custody of their children and so forth. We're not, in that situation the parents still have the paramount right to the custody of their children and of course when Nicole [Appellant] was seventeen that was changed by the court, that was not permanent custody and so forth. I want the court to be mindful of this, you know, this right that she has to custody of her child. We go up until a few years ago when she was visiting regularly with Nicole or Sequoia and I would admit to you certainly if we came back to court 10years ago it wouldn't have been right for her to have Sequoiaback. Her life was not in order." (Emphasis added.) (7/23/04 Tr., p. 75.)
 {¶ 51} Counsel made it clear that Appellant was initially unsuitable as a parent at the time custody was transferred to Julie Bell. This admission was part of a hearing in which the parties and trial judge were discussing the very case that established the unsuitability test. The trial judge subsequently stated his opinion that he thought the unsuitability question had been determined in 1992 in Cuyahoga County:
 {¶ 52} "* * * I don't think that In Re: [Perales] controls here. This is not a situation where it's a first impression type thing where the children are with the parents and we got to now make a determination of whether somebody other than the parent is going to have the child. I believe the issue of unsuitability has already been addressed by the Cuyahoga County Court and you know, we're here today on what the court understands a best interest of the child standard." (7/23/04 Tr., p. 81.)
 {¶ 53} Appellant's counsel did not object or even respond to these comments by the trial judge. We have already ruled that Appellant is not raising any errors on appeal dealing with the trial court's ruling concerning Perales and parental unsuitability. Therefore, it appears from the record that the parental unsuitability issue was raised, was discussed by counsel, was found to have been previously resolved at the time of the original transfer of custody without objection from counsel, and has not been raised on appeal. Given these factual distinctions from Hockstok, there does not appear to be any reason to revisit the issue at this time.
 {¶ 54} Returning now to the specific issue raised by Appellant in this appeal, the record reflects that Julie Bell has had custody of the child since March of 1992; that Appellant was recently addicted to heroin for two years, but entered into rehabilitation for the addiction; that Appellant is living with a man in Cleveland who also has a chemical dependency problem; that Appellant had no contact with Sequoia for years at a time between 1992 and 2004; that Appellant had little contact with the child after she moved back to Cleveland in 2003; that Appellant and Julie Bell have a very antagonistic relationship; that Sequoia has a very close relationship with her grandmother; that Sequoia has some behavioral problems after visiting Appellant; and that there have been problems with visitation, although generally visitation has occurred. Of course, there is conflicting evidence on some of these points, but the trial court is in the best position to weigh the evidence and resolve conflicts in testimony. Thus, there exists some evidence in the record on which the trial court could have relied to overrule Appellant's motion for reallocation of parental rights.
 {¶ 55} There are some problems with the trial court's judgment entry, though. The August 3, 2004, judgment entry does not explain its reasons for overruling Appellant's motion, other than stating that Appellant did not meet her burden of proof. There is no explanation of the factors that the trial court used to make its determination, and in fact, no mention at all that the determination was in the best interests of the child. We have noted that the trial court discussed the best interests test during the custody hearing, but ultimately the court speaks through its journal entries, and the journal entry is silent on this matter. Gaskins v. Shiplevy (1996), 76 Ohio St.3d 380,382, 667 N.E.2d 1194. It is true that the trial court is not required to enumerate or follow any particular best interests factors. See, e.g., Culp v. Burkhart, 5th Dist. No. 04AP010006,2004-Ohio-4425. However, the court is required to provide sufficient information on which to base a review. Trial courts are encouraged to consult the best interests factors found in R.C. § 3109.04(F), dealing with child custody determinations in divorce cases, as a guide in child custody disputes between a parent and nonparent. As stated by the Fourth District Court of Appeals: "the juvenile courts should consider the totality of the circumstances, including, to the extent they are applicable, those factors set forth in R.C. 3109.04(F)." In re Pryor
(1993), 86 Ohio App.3d 327, 336, 620 N.E.2d 973. Whether based on R.C. § 3109.04(F), or some other set of criteria, the juvenile court must apply some type of best interests test when ruling on a modification of custody request in a proceeding arising out of R.C. § 2151.23(A)(2).
 {¶ 56} We agree with the First District Court of Appeals which held that, "[a] juvenile court's decision denying modification will not be reversed on appeal where * * * the court correctly applied the best-interests test, and where its custody decision was amply supported by competent evidence in the record." In re Allah, 1st Dist. No. C0-40239, 2005-Ohio-1182, ¶ 11. Since it does not clearly appear that a best interests test was applied by the trial court, nor is it clear on review what factors support the decision, it is our conclusion that this case must be remanded for the trial court to actually state in the court's journal that its judgment is in the best interests of the child and to explain the reasons underlying that judgment. Therefore, we sustain Appellant's sole assignment of error, and hereby reverse the judgment of the Noble County Court of Common Pleas, Juvenile Division. The case is remanded for further proceedings consistent with this Opinion.
Donofrio, P.J., concurs.
DeGenaro, J., concurs in judgment only; see concurring in judgment only opinion.