[Cite as *In re J.K.*, 2014-Ohio-5502.]

STATE OF OHIO, CARROLL COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | CASE NO.   14 CA 899 |
| | ) | |
| J.K., | ) | O P I N I O N |
| | ) | |
| A MINOR CHILD. | ) | |
| | ) | |


CHARACTER OF PROCEEDINGS:          Civil Appeal from Common Pleas Court,
                                                        Juvenile Division, Case No. 20134052.


JUDGMENT:                                        Reversed and Remanded.


APPEARANCES:
For Plaintiff-Appellant:                        Attorney Vincent Slabaugh
                                                        P.O. Box 836
                                                        Malvern, Ohio  44644


For Defendant-Appellee:                      Beverly Close, *Pro se*
                                                        1201 Scott Avenue
                                                        Ashtabula, Ohio  44004


JUDGES:
Hon. Joseph J. Vukovich
Hon. Gene Donofrio
Hon. Mary DeGenaro


                                                        Dated:  December 15, 2014

VUKOVICH, J.

{¶1} Appellant-father appeals the decision of the Carroll County Common Pleas Court, Juvenile Division, naming appellee-mother as the residential parent of the unmarried parties' young child. The father's first assignment of error asserts that the trial court misapplied the law for an original custody decree by concluding: "The Court further finds no evidence to support a change of custody away from the mother." The father thus proposes that the court did not apply the governing best interests test and did not place the parties on equal footing as statutorily-required. He notes that the court did not make findings and conclusions regarding the best interests factors and did not even use the term "best interests." In his second assignment of error, the father urges that naming the mother as residential parent was not in the child's best interests and was contrary to the manifest weight of the evidence presented at trial.

{¶2} For the following reasons, appellant's first assignment of error is sustained as the language of the decree indicates that the court did not place the parties on equal footing and did not proceed as if this was an original allocation of parental rights and responsibilities. We thus cannot review the merits of the custody decree under the second assignment of error at this time. This case is hereby reversed and remanded for the trial court to reconsider the child's custody under the proper best interests test with additional instructions for the court to explain the reasons underlying its judgment.

## STATEMENT OF THE CASE

{¶3} The parties' male child was born in May of 2012. The family lived with the father's grandparents for a couple months and then moved into a trailer on the grandfather's property. The father owns the trailer. Around Halloween of 2013, when the child was eighteen months old, he went to visit his maternal grandparents in Ashtabula and was expected to return on November 17. As that time drew near, the mother moved out of the trailer and joined the child at her parents' house.

{¶4} On November 21, 2013, the father filed a complaint for custody in the juvenile court, stating that the mother failed to return the child to the house on

November 17 as agreed and she said he could not see the child. The complaint urged that it was in the child's best interests to be placed in the father's custody as the child resided in his house since birth and he was the primary caregiver.

{¶5} At the December 12, 2013 pretrial, the father was represented by counsel and the mother appeared *pro se.* The father pointed out that he had still not seen his son since the end of October and asked for substantial visitation until the full hearing. (Tr. 7). On the same day, the court issued an order stating that the mother was designated residential parent and the father was granted reasonable companionship rights. The court listed a schedule of visitation dates up until the February 12, 2014 pretrial, which was essentially a repeating schedule of two nights with the father and four nights with the mother, with extra days around Christmas. Child support was not ordered as the father did not work and was on SSI.

{¶6} At the February 12, 2014 pretrial, the court was asked to change the visitation to one week on and one week off, so the father did not have to drive to Ashtabula as often since he was the only party with a vehicle and was doing all the driving. An order was entered that same day, providing a repeating companionship schedule of four nights for the father and ten nights for the mother, until the full evidentiary hearing.

{¶7} The trial proceeded on April 17, 2014. The father testified that he lived with the child since birth and he took care of the child when the mother worked. (Tr. 7). He explained that both parents could have been considered the primary caregiver for the first six months of the child's life but the mother then started withdrawing from the family. (Tr. 8-9). He stated that the mother bought an X-box and started playing it online with friends in the bedroom with the door shut, leaving the child in the living room with the father. (Tr. 9). He testified that he fed, bathed, and played with the child. He brought the child to all doctor appointments with the mother coming to half of them (but to none of the visits requiring shots). (Tr. 8, 13). He also stated that he put the child to bed every night. (Tr. 10).

{¶8} The father mentioned that when the mother first moved out, he tried to call her parents' house but there was screaming in the background. He pointed out

that he went without seeing his child from Halloween until mid-December due to the mother's actions. (Tr. 24). He added that he has not missed a visitation, has done all the driving to and from Ashtabula, and is never late. (Tr. 24-25).

{¶9} The father then expressed his concerns with various injuries he discovered on the child. The first time he received the child, his legs were covered in bruises, there were bruises on his arms, he had two knots on his head, and he vomited in the car. (Tr. 25). The father called Children's Services and brought the child to the emergency room and then to follow-up with a doctor. (Tr. 25-26). An investigation was conducted, and it was concluded that the bruises were from normal play. (Tr. 26, 31). The hospital discharge papers and photographs of the child (from this and other days) were submitted as exhibits.

{¶10} When the father exercised his third scheduled visitation, the child had bruising on the inner thigh and the back of his legs, a bruise on his head, bug bites (in winter), and scratches. (Tr. 33). Then, during the week of Valentine's Day, the mother told him the child had a bruise on his head from falling. When the father thereafter noticed a second bruise on the child's head, he called the mother and she added that he also fell in the bathtub and hit his head on the faucet. (Tr. 36). During both visits, he called Children's Services and took photographs. (Tr. 33, 37).

{¶11} On picking the child up on March 13, 2014, his face was scratched and his feet were blistered and bleeding; the father opined it looked like his feet had been scalded. The photographs support his concern. (Tr. 38). The father also disclosed that the mother has not provided him with the child's medical card, even though she told the court at the December 12 hearing that she would provide it to the father the next day.

{¶12} Finally, the father testified that he had recently witnessed the child performing "full force" head-butts against walls, doors, and floors and punching himself in the head with toys. (Tr. 40). From this, the parents decided that the child should be checked for autism, and an appointment was scheduled for the next week. (Tr. 41). The father concluded that he had an established ability to take care of the child and expressed concern that the mother could not, noting that she was

previously living with her parents but was now in an apartment without a vehicle. (Tr. 47-48).

{¶13} The father then called two friends to testify that the mother starting secluding herself in the bedroom instead of interacting with the child and that the father did most of the caregiving. (Tr. 53-55, 68-72). The father's mother (the child's paternal grandmother) then confirmed that both parents were good with the baby at first, but once the child started moving around, the father took over the child's care by fixing the bottles and food and bathing the child. (Tr. 79-80). She stated that the mother isolated herself from the child by staying in the bedroom with the door closed, despite the child standing at the door calling for her attention. (Tr. 80-81). She said the parties asked her to help with the child several times. (Tr. 88). This paternal grandmother mentioned that her eight-year-old child (the subject child's uncle) spends many weekends at the father's house. (Tr. 84).

{¶14} The paternal grandmother also testified that she once witnessed the mother smack the child hard when he would not stay still to have cake cleaned from him. (Tr. 85). She also claimed to have seen the mother slap the child in the face. (Tr. 86). She said the mother would get mad and frustrated and tell the child, "I'm going to punch you in the face," the father would intervene and remove the child from the situation, and the mother would declare that it was her child and she could say what she wanted. (Tr. 86-87).

{¶15} The mother appeared *pro se* with no witnesses. She admitted that she isolated herself at times. She noted that she worked and would then hide herself in her bedroom, sometimes to sleep and sometimes to play on the X-box with friends. (Tr. 95-96). Still, she insisted that she spent time with the child as well. She also said, "I've changed." She testified that she moved out because the father got mad at her the month before and threw dishes at her. (Tr. 96).

{¶16} The mother explained that she just moved out of her parents' house, and she and her sister moved into an apartment with the child. (Tr. 96). It was said that her rent was $425 plus all utilities, she worked 20-25 hours per week at a restaurant, and her sister was unlikely to contribute to the first month's rent. (Tr. 96,

98). Her parents are willing to drive her places as they live five minutes away. (Tr. 99). She testified that they watch the child while she works and her brother and her other sister live with her parents. (Tr. 96, 100).

{¶17} The mother insisted that neither she nor anyone in her parents' household caused the bruises in the photographs, stating that the child was learning how to run or climb stairs and that he bruised easily. (Tr. 96-97, 105). She disclosed that the child once head-butted her, which caused bruises on both of their foreheads. (Tr. 105). The mother said that she spanks the child on the buttocks but does not hit him anywhere else. (Tr. 96). She was not asked to explain the wounds to the child's feet. As to the medical card, she claimed that (for the past four months) she kept forgetting to provide the father with it. (Tr. 102).

{¶18} The mother admitted to posting a video on Facebook of the child speaking to his father on the phone; counsel suggested that this seemed disrespectful to the father's privacy to which she answered that what goes on in her house is her business. (Tr. 107). In order to rebut her testimony about people in her parents' house having physical contact with the child, counsel tried to place into evidence a video from her Facebook page regarding the conduct of people in her house, but the court would not allow it, stating that she had already stepped off the stand and it would otherwise be hearsay. (Tr. 108-109).

{¶19} On April 21, 2014, the trial court issued a decision designating the mother as the residential parent and providing the father companionship every other Thursday at 11:00 a.m. until Monday at 6:00 p.m. with standard holiday visitation and two non-consecutive weeks in the summer (to increase to four when the child starts school). The court stated the child's date of birth and found: the parties lived together until mid-November of 2013 when the mother moved with the child to her parents' house in Ashtabula; the evidence does not show abuse, neglect, or dependency; and the child may need medical testing. The decree concluded: "The Court further finds no evidence to support a change of custody away from the mother." The father filed a timely notice of appeal.

ASSIGNMENT OF ERROR NUMBER ONE

{¶20} The father sets forth two assignments of error, the first which provides:

{¶21} "The trial court's Order designating the Appellee-Mother residential parent of the minor child of the parties based on the conclusion that the 'court found no evidence to support a change of custody away from the mother' was a misapplication of the law regarding the allocation of parental rights and responsibilities under R.C. 3109.04."

{¶22} In determining the best interests of a child, the court shall consider all relevant factors, including but not limited to: (a) the parents' wishes; (b) the child's wishes if the court has interviewed the child; (c) the child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interests; (d) the child's adjustment to home, school, and community; (e) the mental and physical health of all relevant persons; (f) the parent more likely to honor and facilitate court-approved parenting time or companionship rights; (g) whether either parent has failed to make child support payments pursuant to a support order; (h) whether either parent or any member of their households has been previously convicted of certain criminal offenses involving children; (i) whether the residential parent has continuously and willfully denied the other parent's right to parenting time in accordance with a court order; and (j) whether either parent has or is planning to establish a residence outside of Ohio. R.C. 3109.04(F)(1)(a)-(j).

{¶23} In weighing these best interests factors, no one factor is dispositive. *Gomez v. Gomez*, 7th Dist. No. 06NO330, 2007-Ohio-1559, ¶ 32 citing *Nentwick v. Nentwick* (Feb. 18, 1998), 7th Dist. No. 96JE27. And, the court can consider matters that are not specifically listed. *Id.*, citing R.C. 3109.04(F)(1) ("including, but not limited to"). Thus, the court can consider who the primary caregiver was and the practicalities of placing the child with one parent, including the adjustments the child will have to make.

{¶24} When making an original decree allocating parental rights and responsibilities, R.C. 3109.04(B)(1) instructs that the test to be applied by the court is the best interests of the child. *See, e.g., Lipp v. Lipp*, 7th Dist. No. 10CO38, 2011-

Ohio-5759, ¶ 45. However, when a court is issuing a modification of a prior decree allocating parental rights and responsibilities, there must be a change in circumstances and the modification must be necessary to serve the child's best interests. R.C. 3109.04(E)(1). This division permitting a modification continues to specify that the court is required to maintain the prior residential parent unless modification is in the child's best interests and: (i) there is an agreement, (ii) with the consent of the residential parent, the child has been integrated into the family of the other, or (iii) the harm likely to be caused by a change of environment is outweighed by the advantages of the change to the child. R.C. 3109.04(E)(1)(i)-(iii).

{¶25} Pursuant to R.C. 3109.042, an unmarried female who gives birth to a child is the sole residential parent until a court issues an order designating another person as such. Yet, in designating a residential parent over such child, the court "shall treat the mother and father as standing upon an equality when making the designation." R.C. 3109.042.

{¶26} Thus, even though the unmarried mother is the residential parent until a court order says otherwise, when the court is first asked to issue an order, the matter is considered an original custody determination rather than a ruling on a request for modification of a prior custody determination. *In re S.S.L.S.*, 7th Dist. No. 12CO8, 2013-Ohio-3026, ¶16; *Maine v. Jones*, 7th Dist. No. 06MA191, 2007-Ohio-5043, ¶ 55, 57; *Francis v. Westfall*, 7th Dist. Nos. 03JE20, 03JE21, 2004-Ohio-4543, ¶ 15. *See also DeWitt v. Myers*, 2d Dist. No. 08–CA86, 2009-Ohio-807, ¶ 14-16. Even though the mother may have had custody via operation of law, there is no presumption in her favor when an original order of custody is sought. *Id.*

{¶27} Likewise, the references to modification of custody in R.C. 3109.04(E) do not apply when changing a temporary order of custody. *Gomez*, 7th Dist. No. 06NO330 at ¶13-16; *Schmidli v. Schmidli*, 7th Dist. No. 02BE63, 2003-Ohio-3274, ¶ 21-22. "Ohio law provides that R.C. 3109.04(E), concerning modification of a prior decree, is inapplicable to temporary orders with custody pending." *Id.*, citing *State ex rel. Thompson v. Spon*, 83 Ohio St.3d 551, 554-555, 700 N.E.2d 1281 (1998).

**{¶28}** Pursuant to Civ.R. 75(N)(1), the court may make a temporary order regarding allocation of parental rights and responsibilities during the pendency of an action for divorce. "When the court later fashions a custody order in finally resolving the divorce, it is not modifying a prior final custody decree; rather, it is entering a permanent custody order for the first time." *Id.*, citing *Spon*, 83 Ohio St.3d at 554-555. *See also Garnet v. Garnet*, 7th Dist. No. 80CA31 (Mar. 2, 1981).

**{¶29}** In accordance, as there was no prior final decree allocating parental rights and responsibilities here, this was not a modification case. Rather, only the best interests test applied in determining who should be named the residential parent. The issue before the court did not involve a change of custody, and there was no need to consider changed circumstances. Instead, the parties were to start on equal footing.

**{¶30}** The trial court did not mention the best interests of the child and concluded: "The Court further finds no evidence to support a change of custody away from the mother." In utilizing such language, it cannot be ascertained whether the court understood that the sole test before it was the child's best interests. Rather, the language of the decree demonstrates that the court did not place the parties on equal footing.

**{¶31}** Appellant points out in the next assignment of error that the trial court did not mention "best interests" or make findings and conclusions on the best interests factors. We note that some factors were not relevant or had no testimony thereon and the trial court did state that the evidence did not show abuse, neglect, or dependency and that the child may need testing to ascertain if he suffers a medical condition, which arguably fell under R.C. 3109.04(B)(1)(e) (mental and physical health of all relevant people) or any other relevant consideration. We have pointed out that there is no statutory mandate that a trial court separately address each of the best interests factors. *In re Henthorn*, 7th Dist. No. 00BA37 (Nov. 28, 2001) (but recommending the trial court review the factors in its entry). And, we have stated that we presume the court considered the factors *absent evidence to the contrary*. *Id.*

**{¶32}** The fact that the court did not mention the best interests test, did not discuss various other pertinent factors, and used the language discussed above provides this evidence to the contrary. In another case, where we could not determine whether the court used the proper test, we remanded with instructions for the court to specifically refer to the best interests test and to explain the reasons underlying the judgment. *In re Bell*, 7th Dist. No. 04NO321, 2005-Ohio-6603, ¶ 55-56.

ASSIGNMENT OF ERROR NUMBER TWO

**{¶33}** Appellant's second assignment of error contends:

**{¶34}** "The trial court's Order designating the Appellee-Mother residential parent of the minor child of the parties is not in the best interest of the child, pursuant to the factors set out in R.C. 3109.04(F)(1), and is against the manifest weight of the evidence."

**{¶35}** A merit decision regarding the custody of a child shall not be reversed absent an abuse of discretion. *Davis v. Flickinger*, 77 Ohio St.3d 415, 416-417, 674 N.E.2d 1159 (1997). In order to find an abuse of discretion, the reviewing court must conclude that the trial court's decision was unreasonable, arbitrary or unconscionable. *Pater v. Pater*, 63 Ohio St.3d 393, 396, 588 N.E.2d 794 (1992). The trial court, rather than the reviewing court, is in the best position to weigh the testimony and observe the witnesses' demeanor, voice inflections, and gestures in order to gauge their credibility. *Davis*, 77 Ohio St.3d at 418. These first-hand credibility evaluations are crucial in child custody cases. *Id.* at 419. *See also Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988) (emphasizing that the knowledge the trial court obtains at trial cannot be conveyed through a printed record).

**{¶36}** However, we cannot review the court's exercise of discretion where the custody determination is being remanded for the utilization of the proper test for an original allocation of parental rights and responsibilities. The prior assignment of error is dispositive at this time. As we must remand for reconsideration of the custody decision, we cannot review the merits of the custody award.

**{¶37}** For the foregoing reasons, the judgment of the trial court is reversed and the case is remanded for the court to reconsider custody under the proper best interests test with additional instructions for the court to explain the reasons underlying its judgment.

Donofrio, J., concurs.
DeGenaro, P.J., concurs.