OPINION *Page 2 
{¶ 1} Appellant Melissa Maine [the mother] appeals the decision of the Mahoning County Juvenile Court naming appellee Patrick Jones [the father] as the residential parent of the parties' child. The issue on appeal is whether the custody decision was in the child's best interests. More specifically, the mother claims that the court awarded custody to the father to punish her for certain conduct, and she complains that the court ignored the stability of the child's current home. For the following reasons, the judgment of the trial court is affirmed.
 STATEMENT OF THE CASE {¶ 2} On December 24, 2001, the unmarried mother and father gave birth to a daughter. They lived together in Lake Milton, Ohio. Their relationship ended soon thereafter, and the mother and child moved to Struthers, Ohio with the maternal grandmother. Although there was no court order, the father paid child support and exercised weekly visitation. (Tr. 64).
 {¶ 3} On a Saturday in August of 2004, the mother picked the child up from the father's home and advised that the child was going camping on Thursday with her maternal grandmother. (Tr. 67). Her statement did not seem sincere to the father as she had once mentioned moving to California to teach purportedly because she was unable to find a regular teaching job in town after applying to three school districts. (Tr. 65-66). Thus, the father was suspicious and decided to exercise overnight visitation the Tuesday before his daughter was to leave. At this time, he had a paternity test performed in anticipation of a custody battle due to his fear that the mother was covertly moving the child to California. (Tr. 67).
 {¶ 4} As the father feared, the child was relocated to Palm Desert, California that week. She was escorted there by her maternal grandmother, but the mother remained behind for a few weeks. The mother grew up in California. The maternal grandfather and the maternal uncle live in Palm Desert, and a maternal great aunt lives over an hour away in Los Angeles.
 {¶ 5} In the meantime, the mother filed a motion for child support and allocation of parental rights. The father filed competing motions. His paternity was officially confirmed in April 2005. The parties then conducted negotiations and *Page 3 
reached a temporary agreement as to companionship which was to last until the child reached school age. After repeated requests, the mother, however, failed to return an executed copy of the agreement to the court for approval.
 {¶ 6} According to the parties' verbal understanding and unexecuted agreement, the father was to receive six weeks of visitation that summer starting on June 15, 2005. He did not receive the child until July 1, 2005. Various motion hearings were held, some of which the mother failed to appear. For instance, she had been ordered to present the signed agreement or appear on December 22, 2005 for further hearing. However, she failed to do either. The father filed motions to have her held in contempt for these failures.
 {¶ 7} At that time, the father had the child for Christmas visitation. He thus asked the court that the child remain in his temporary custody instead of returning after Christmas. The court agreed, and a hearing was set for February 2, 2006. It has been noted that the unsigned agreement gave the father custody for the month of February anyway; thus, allowing the child to stay through January could be considered a substitute for the February visitation if the court later found at the February 2 hearing that he should not have temporary custody. At the February 2, 2006 hearing, the court permitted the mother to retain custody of the child pending the final hearing, pointing out that an unmarried mother is the statutory default custodian.
 {¶ 8} The matter of custody was set for final trial on March 29, 2006. The mother failed to appear. The father thus added this date to his contempt motion. The trial began without the mother, but with her counsel. It continued the next day where the mother appeared and stated that she had a flat tire on the way to the airport, her spare was also flat and she missed her rescheduled flight due to an airline representative misstating the departure by fifteen minutes. The trial continued through March 31, 2006 and resumed again on May 17, 2006.
 {¶ 9} At trial, a family friend testified that her children play with the child at issue when the child is in Ohio. She opined that appellant is a wonderful father who actively plays with and teaches his child and who is one of the few men she would ever trust with her children. She noted that she had witnessed the child's sad and silent demeanor after getting off the telephone with her mother, who seemed to have *Page 4 
been telling the child about her problems with the father. (Tr. 38). A neighbor who is married to the father's cousin also testified to the father's skill at parenting and to the child's happiness at her father's home.
 {¶ 10} The father testified that he has lived at his current address for three years and lived right next door before that. (Tr. 64). He stated that for the past sixteen years he has run his own automotive business, which is located next door to his home. (Tr. 94). With regard to local family, the father noted that: the paternal grandmother lives two blocks from his house; a paternal uncle lives two houses down from the grandmother and has the child's cousins staying with him every other weekend; another paternal uncle lives in Dayton, Ohio; two of the father's cousins live next door to him as do his aunt and uncle. (Tr. 77-78). The father testified that when the child stays with him, he allows regular access to the maternal grandmother who lives in Struthers. (Tr. 80). He pointed out that a maternal aunt and maternal cousins also live in town. (Tr. 79).
 {¶ 11} He stated that the child enjoys a great relationship with all her paternal and maternal relatives while she resides with him and that he believes in fostering such contact. (Tr. 81-82). For instance, the child spoke to her mother almost every day while she was in Ohio. (Tr. 98). He notes, however, that when the child is in California she speaks to no paternal relatives and that even he has difficulty contacting her. He pointed out that the mother has no land line and that her wireless telephone has been turned off three different times in the past few months. (Tr. 73, 440-441). He stated that the mother never provided him with a way to contact her when her phone was off and never warned him of the disconnections. He also made note of the price of plane tickets, which prevents him from visiting his daughter in California on any regular basis.
 {¶ 12} The father opined that if he received custody, the mother would return to Ohio. (Tr. 93). He stated that if this happened, he would be happy to share custody. (Tr. 101). He expressed that if the mother is named the residential parent, he will have a difficult time exercising companionship and contact. (Tr. 107, 447). He expressed dismay at how his daughter recently asked him why he has not sent money to her mother and inquired when he would do so. (Tr. 444). *Page 5 
 {¶ 13} The mother testified that she failed to give appellant either of her California addresses because she feared him due to his threats about what would happen if she moved with the child. Instead, she gave him her father's address where he could send child support. (Tr. 164). She claimed that the father was violent once on the day before she left him in April 2003 and once a few days after she left him when he pulled her hair. (Tr. 166). She said she filed an incident report with Lake Milton police for one of the incidents, but she did not produce such record.
 {¶ 14} As to the temporary agreement, she testified that she remembers signing it, but does not remember mailing it. She also stated that she did not receive the numerous requests from her prior counsel regarding the failure to return the agreement. (Tr. 254). She said she did not wonder why she never received a court-signed and time-stamped copy of the agreement. (Tr. 263). She then provided reasons for missing the various court hearings.
 {¶ 15} The mother also testified that she is teaching first grade and puts the child in pre-school/daycare from 7:15 a.m. until 3:15 p.m. (Tr. 266). The child was to start a half-day of kindergarten in the fall of 2006 and was then to attend the prior daycare. (Tr. 311). The mother disclosed that her boyfriend, Mr. Al O'Connell, moved to California with her and is living with her and the child. She states that he has a lucrative painting and remodeling business but also disclosed that her telephone problems stem from her paying her bills late. (Tr. 237).
 {¶ 16} The maternal grandmother, who is a developmental psychologist for a local school district, testified that it was difficult for her when the child moved to California because the child had been part of her daily life. (Tr. 351). The maternal grandmother noted that she has no problems communicating with the father and that he allows her regular and frequent visitation when the child is with him. (Tr. 359-361).
 {¶ 17} The guardian ad litem pointed out that she only conducted a home study for the father since the mother lived in California. Her initial report recommended custody to the mother but liberal long-distance visitation to the father. She filed a supplemental report in response to the court's desire to learn about the background of the live-in boyfriend. According to the mother, Mr. O'Connell was forty-two at the time of the hearing. The guardian ad litem was unable to speak to Mr. O'Connell and was *Page 6 
unable to interview the child regarding Mr. O'Connell. The mother provided his social security number; however, it turned out to be incorrect by one number. (Tr. 434).
 {¶ 18} Eventually, a background check revealed that Mr. O'Connell, was convicted in 1997 for attempted possession of cocaine, a first degree misdemeanor, and attempted aggravated trafficking in cocaine, a third degree felony, which offenses arose from separate incidents. Both offenses had been reduced from the original charges under a plea agreement. He was put on probation, which he completed in 1999. The guardian ad litem also discovered seven convictions for driving under the influence during the following years: two in 1983, 1990, 1994, 1997, 2001, and 2003. (Tr. 412). The mother had testified that she was unaware that her boyfriend had any convictions for drug or alcohol related offenses.
 {¶ 19} On August 24, 2006, the magistrate issued its 35 page decision which recited extensive findings of fact and conclusions of law, enumerated the statutory best interest factors, and concluded that the father should be named the residential parent. In doing so, the magistrate found that the father was most likely to adhere to court orders and to facilitate companionship and communication with the mother and other relatives. The magistrate also found the father's testimony credible, sincere and full of insight. In contrast, the mother's testimony was described as being less credible, disingenuous and defensive (noting that although she graduated from Youngstown State University cum laude, she claimed ignorance regarding the need to appear, the importance of providing notice of telephone and address changes and the importance of a signed and stamped court order). The magistrate's findings and conclusions will be discussed more fully during our review of the best interest factors below.
 {¶ 20} The mother filed timely objections to the magistrate's decision. A transcript of the four-day hearing was ordered, and the juvenile court heard oral arguments. The order of custody was stayed during this time. On December 15, 2006, the trial court affirmed the magistrate's decision, designated the father as the residential parent and granted the mother the court's standard long-distance companionship. *Page 7 
 {¶ 21} The court noted that the mother was found to lack credibility and failed at her efforts to comply with court orders. The court stated that the record was replete with evidence of her attempts to frustrate the court proceedings, the guardian ad litem's investigation and the father's contact with his child. The court pointed out how the mother abruptly ended the father's close weekly relationship without notice. The court found that the father encourages bonds with both sides of the family and agreed with the magistrate's conclusion that the father can provide the most stable, secure and wholesome environment.
 {¶ 22} The court's judgment concluded that the magistrate's decision complied with law, was not contrary to the manifest weight of the evidence and did not constitute an abuse of discretion. The mother filed timely notice of appeal. She sought a stay in this court, which was denied. On appeal, she sets forth two assignments of error.
 GENERAL LAW ON ALLOCATION OF CUSTODY {¶ 23} When making an original allocation of parental rights and responsibilities, the court shall take into account the child's best interests. R.C. 3109.04(B)(1). In determining the best interests of a child, the court shall consider all relevant factors, including, but not limited to: (a) the parents' wishes; (b) the child's wishes if the court has interviewed the child; (c) the child's interaction and interrelationship with the child's parents, siblings and any other person who may significantly affect the child's best interests; (d) the child's adjustment to home, school, and community; (e) the mental and physical health of all relevant persons; (f) the parent more likely to honor and facilitate court-approved parenting time rights or companionship rights; (g) whether either parent has failed to make all child support payments pursuant to a child support order; (h) whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to certain criminal offense involving children; (i) whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with a court order; and (j) whether either parent has established a residence, or is planning to establish a residence, outside of Ohio. R.C. 3109.04(F)(1)(a)-(j). *Page 8 
 {¶ 24} "The statutory standard is written broadly and requires the domestic relations judge to consider all factors that are relevant to the best interests of the child. The purpose of a far-reaching inquiry is to allow the judge to make a fully informed decision on an issue as important as which parent will raise the child. The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record.' (Citations omitted.) Miller v. Miller (1988),37 Ohio St.3d 71, 74, 523 N.E.2d 846, 849. A reviewing court will not overturn a custody determination unless the trial court has acted in a manner that is arbitrary, unreasonable, or capricious. Id." Pater v.Pater (1992), 63 Ohio St.3d 393, 396.
 ASSIGNMENT OF ERROR NUMBER ONE {¶ 25} The mother's first assignment of error contends:
 {¶ 26} "DESIGNATION OF A RESIDENTIAL PARENT MUST FOCUS ON THE BEST INTEREST OF THE CHILD, NOT THE BEHAVIOR OF A PARENT."
 {¶ 27} The mother claims that the court abused its discretion and committed a legal error by focusing on the mother's conduct of violating court orders and awarding the father custody as a punishment for the mother's misconduct. The mother states that there is no connection between missed court appearances and the welfare of the child. She cites cases that stand for the general proposition that a child is not to be used as a penalty for poor conduct and that consideration of moral values is limited to the effect a parent's behavior has on the child. See Wyss v. Wyss (1982), 3 Ohio App.3d 412; Whaley v. Whaley (1978),61 Ohio App.2d 111.
 {¶ 28} This proposition of refraining from using custody as a penalty is generally correct because the test at issue is solely best interests of the child and because the child's best interests can be unaffected by certain conduct. However, as will be discussed below, there are times when certain conduct can affect a child's best interests or can be used to determine whether a child's best interests may be affected by a parent in the future. We also note that other portions of the appellate cases the *Page 9 
mother cites have no application here as they deal with change of custody rather than initial allocation. See id.
 {¶ 29} First, the magistrate did not purport to punish the mother by granting custody to the father. Rather, any punishment of the mother occurred when the magistrate found her in contempt for her failure to appear at two of the many hearings she missed. For this, the court fined the mother and ordered compliance with court orders. Thus, much of the discussion of her missing court hearings related to these contempt findings, not custody.
 {¶ 30} Contrary to the text of the assignment of error, the court is permitted to consider the behavior of the parent as it applies the best interest factors. In fact, the parent's conduct is a statutorily required consideration in most of the factors. For instance, a parent's conduct is relevant in determining the following factors: commission of a criminal offense involving children or living with someone who did so; moving out of state; mental health and any acts establishing such; facts which tend to establish which parent is most likely to honor court ordered parenting time and companionship; and, prior payment of court-ordered child support. Since conduct can be considered in the listed factors, it can also be considered as any other relevant factor as the list is not exclusive. See R.C. 3109.04(F)(1).
 {¶ 31} The mother's conduct of failing to comply with court orders can be considered as evidence of how she will comply with future court orders including visitation. This is a legislatively-approved consideration. R.C 3109.04(F)(1)(f). Furthermore, the statute specifically permits the court to conduct an investigation on the parent's past conduct. R.C. 3109.04(C).
 {¶ 32} Regardless, the custody order was based upon consideration ofall factors and other relevant factors under R.C. 3109.04(F)(1). Although her conduct in failing to appear may have been one consideration in weighing relevant factors, it was not the sole or overriding consideration as the mother suggests. Rather, it was merely one among many factors the court considered in determining its allocation. The court painstakingly considered every other factor, making findings and conclusions regarding the relevant factors and discarding the irrelevant factors. *Page 10 
 {¶ 33} First, the court found that both parents wished to be the residential parent. See R.C. 3109.04(F)(1)(a). Second, the court stated it did not interview the child. See R.C. 3109.04(F)(1)(b). Third, the court evaluated the child's interaction and interrelationship with the parents and other persons who significantly affect the child's best interests. See R.C. 3109.04(F)(1)(c).
 {¶ 34} Specifically, the court noted a close bond with both parents. The child was found to have a good relationship with the maternal grandfather, maternal uncle and maternal great aunt, who all live in California. The court found there was unclear and unspecific evidence of the child's relationship with the mother's boyfriend who has lived with them since they moved to California over two years prior. Moreover, the guardian ad litem could not conduct a home study and could not contact the boyfriend when asked to further investigate him.
 {¶ 35} The maternal grandmother lives in Struthers, Ohio and exercises regular visitation when the child is here. Additionally, the father has many relatives residing right in his neighborhood with whom the child has a good relationship. Moreover, the court was informed of family friends with whom the child visits while in Ohio and with whom the child would attend school.
 {¶ 36} The court noted that the mother had been the primary caretaker but that this was by design since she moved to California where the father could no longer exercise his regular weekly visitation (and the maternal grandmother was no longer seen on a daily basis). The court also noted that the designation of primary caretaker is not the sole or overriding consideration in an original order of custody.
 {¶ 37} Fourth, the court evaluated the child's adjustment to home, school and community. The court found that the child is amazingly resilient, noting that the child relocated to California and stayed there for three weeks without her mother. It was suggested that adjustment to Ohio would be made easier by the many friends and family, including the presence of the maternal grandmother with whom the child has a close bond. The court pointed out that when the father had the child for six weeks in the summer and more than two months in the winter, there were no complaints from either party about adjustment problems. The court also found that the child integrates into the father's home as soon as she arrives. The court acknowledged the mother's *Page 11 
testimony that the child is doing well in preschool where she has friends and again recognized that the child had a close relationship with her three maternal relatives in California.
 {¶ 38} Fifth, the court stated that the mental and physical health of the parents and child was not at issue. See R.C. 3109.04(F)(1)(e). This statutory factor also directs the court to consider the health of any relevant person. The court stated that there was no evidence concerning the mother's boyfriend's health. Yet, there was testimony about a prior request for treatment in lieu of conviction. Moreover, seven drunk driving convictions and two drug convictions involving cocaine arising from separate incidents in the same year can constitute some evidence regarding the boyfriend's health or at least prior health. We also should note here that the maternal grandfather was said to have suffered a massive stroke in October 2005 and has lingering effects that interfere with his daily life.
 {¶ 39} Sixth, the court found that the father was the parent most likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights. See R.C. 3109.04(F)(1)(f). The court recognized that the parties were not under a court order pending the final decision. However, as opined by the court, the parties' conduct regarding child-exchange events is relevant to the child's best interests.
 {¶ 40} Relevant to that factor, the court noted that the father encouraged relationships of the child with his family and with the mother and her family as well. The maternal grandmother testified as to her regular and frequent visitation with the child while the child is at the father's home. The father explained that the mother can easily contact the child while at his home but that he has difficulties contacting the child as the mother does not facilitate the contact as well as he does. Moreover, the mother does not have a land line and has regular disconnections of her cellular telephone. The court disbelieved the mother's testimony that she provided the father with her live-in boyfriend's wireless number and believed the father's testimony that the only reason he had the boyfriend's number was from his caller identification after the mother once called him from this number. Additionally, the fact that her boyfriend *Page 12 
has a cellular telephone is not compelling as this phone would presumably always be on his person, rather than in an accessible place in the residence.
 {¶ 41} The mother's act of moving the child to California without notice to the father and weeks before the mother herself was even moving there is telling of her attitude and lack of respect toward the father's relationship with the child. The court found that this behavior deprived the child of emotional support during the move, which is a critical time in a child's life. In fact, the father was never provided with the child's address in California. Rather, he was given only the maternal grandfather's address for sending child support.
 {¶ 42} The court found a lack of credibility surrounding much of the mother's testimony, including her claim that she feared the father or that he engaged in two acts of violence against her, one unspecified and one regarding hair pulling. The court felt this untruthfulness was illuminating of her character.
 {¶ 43} Seventh, the court evaluated the child support factor. See R.C.3109.04(F)(1)(g). Although there was no order of child support, the court found it relevant that the father regularly paid child support since they separated and increased his payment after the move due to the need for full-time daycare/preschool. The father did not send money when the child was with him.
 {¶ 44} Eighth, the court found that neither parent has been convicted of an offense regarding children. See R.C. 3109.04(F)(1)(h). Ninth, the court found that the denial of parenting time factor was inapplicable since it deals with the conduct of a residential parent that is subject to a court order and there was no court custody order here. See R.C.3109.04(F)(1)(i). Still, the court found the parties' conduct regarding exercise of visitation to be a relevant factor and noted that the mother did provide visitation to the father even in the absence of a court order. The court opined that any missteps have more to do with the factors concerning facilitation of future visitation and her credibility.
 {¶ 45} Tenth, the court evaluated whether either parent has established a residence, or is planning to establish a residence, outside of Ohio. See R.C. 3109.04(F)(1)(j). The mother currently lives more than 2,300 miles from the father and the child's place of birth and first few years. The court recognized that the mother was *Page 13 
permitted to leave the state without leave of court since she was an unmarried mother and noted that she moved near family in a community where she had been raised.
 {¶ 46} On the other hand, the court pointed to the mother's testimony that the cost of living in Palm Desert California, an hour from Los Angeles, is much higher than here. The mother earned $38,000 per year and stated that her boyfriend's remodeling business is lucrative due to the booming economy. Yet, the court worried that the mother characterized the boyfriend's situation as him living with her, rather than them living together. There was no testimony that he provided household support. Notably, they had no land line, his was the only working telephone, and the mother has problems paying her phone bills. The court found these issues to be inexplicable.
 {¶ 47} Finally, as to any other relevant factor, the court found issues with the mother's credibility concerning the boyfriend's prior convictions. The court also worried about her providing an incorrect Social Security number for her boyfriend to a court official. The court considered the guardian ad litem's report, weighed the initial recommendation to grant custody to the mother and noted that such recommendation is not binding.
 {¶ 48} The court also considered the parties' work schedules. The mother had the child in preschool and daycare from 7:15 a.m. until 3:15 p.m. The next year, the child was to attend half-day kindergarten and attend daycare the remainder of the day. The father works right next door to his home and has a flexible schedule which could be adapted to accommodate the child's schedule. The court pointed out how the mother's schedule as a teacher with summers off would provide her with maximized visitation time in the summer when she will have the child without having to work.
 {¶ 49} The court judged the father as mature and full of insight. His demeanor and actions in and out of court made an impression on the court. He was not disrespectful toward the mother and testified without rancor. On the contrary, the court generally found the mother's testimony to be "disingenuous at best," lacking in credibility, defensive and calculating. The court also noted how in one telephone conversation, the child asked the father to send money to the mother.
 {¶ 50} The court weighed all of the statutorily enumerated and other relevant factors and concluded that it was in the child's best interests that the father be *Page 14 
designated the residential parent. The court concluded that the father can provide the child with the most stable, secure and wholesome environment, had the benefit of a flexible schedule with an office nearly at home, would encourage universal familial bonding, would adhere to court orders and would facilitate parenting time and contact.
 {¶ 51} As can be seen, it was not the mother's conduct in failing to attend various court hearings that was the basis of the court's holding nor was it even one of the main reasons. The court thoroughly established a connection between each of its findings and the best interests of the child. Although it would not have been unreasonable to have named the mother the residential parent, it was not unreasonable to name the father the residential parent instead. The arguments regarding the mother's role as the primary caretaker will be more fully discussed where raised infra.
 ASSIGNMENT OF ERROR NUMBER TWO {¶ 52} The mother's second assignment of error provides:
 {¶ 53} "IT IS AN ABUSE OF DISCRETION TO IGNORE THE REALITIES OF A SITUATION WHEN IN [SIC] DETERMINING WHICH PARENT SHOULD BE RESIDENTIAL PARENT."
 {¶ 54} The mother cites R.C. 3109.042, which provides:
 {¶ 55} "An unmarried female who gives birth to a child is the sole residential parent and legal custodian of the child until a court of competent jurisdiction issues an order designating another person as the residential parent and legal custodian. A court designating the residential parent and legal custodian of a child described in this section shall treat the mother and father as standing upon an equality when making the designation."
 {¶ 56} The mother complains that the court utilized the second half of the statute without recognizing the first half that gave her residential parent status. She alleges that the court ignored the fact that she has always been the child's primary caretaker and states that the child has a stable home life which the court's order will disrupt. She contends that the test is not which parent has the better environment, but cites cases dealing with modification of prior custody orders. The mother's position, however, is untenable for several reasons. *Page 15 
 {¶ 57} First, this is an original allocation of parental rights. As the father urges, the mother's argument essentially acts under an assumption that custody is predetermined for an unmarried mother when a party finally seeks a court order regarding allocation of parental rights and responsibilities. However, there was no prior order of custody here; so, the only test is that of the child's best interests, which encompasses a weighing of a multitude of factors. R.C.3109.04(F)(1). Since there was no prior custody order, this is not a modification of custody case. See R.C. 3109.04(E)(1)(a). Thus, changed circumstances and the other tests in R.C. 3109.04(E)(1)(a) are inapplicable.
 {¶ 58} Second, contrary to the mother's suggestion, the court never stated that the test was which parent had the better environment. However, that can be one consideration under R.C. 3109.04(F)(1). Cf.Whaley, 61 Ohio App.2d 111 and Wyss, 3 Ohio App.3d 412 (which are modification cases).
 {¶ 59} Third, the court did consider the fact that the child would be leaving her home in California where she lived with her mother. As the mother points out, the court found that the mother was the primary caretaker by design. Notably, she surreptitiously moved the child to California, instituted this action and then failed to appear for the various hearings or sign the entry that she herself negotiated. As the court implied, these actions could conceivably have been done in order to draw out the final decision on custody and provide her with even more leverage to argue that she was the primary caretaker for some time. The court weighed its decision to take the child from her current home with the other factors and noted the undisputed testimony that the child is resilient and easily adjusts to each parent's home.
 {¶ 60} As set forth supra, a reasonable court could have awarded residential parent status to the mother with whom she had primarily resided. However, this does not mean that the court's decision to award such status to the father instead was unreasonable or arbitrary. Either decision was supported by the evidence presented. The court was in the best position to make credibility determinations and weigh the testimony and factors. As there is not an abuse of discretion, we shall not substitute our judgment for that of the trial court. As such, both assignments of error are overruled. *Page 16 
 {¶ 61} For the foregoing reasons, the judgment of the trial court is hereby affirmed.
 Donofrio, J., Waite, J., concurs. *Page 1